**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

JOHN ALEXANDER WAGNER, # 371-133     *
            *
Plaintiff,             *
            *
v             *       Civil Action No. ELH-14-791
            *
WARDEN, et al             *
            *
Defendants.             *
            ***

**MEMORANDUM OPINION**

In multiple submissions, John Alexander Wagner, a self-represented prisoner incarcerated at North Branch Correctional Institution ("NBCI"), has sued a laundry list of about 50 defendants,[1] pursuant to 42 U.S.C. § 1983. In general, Wagner alleges inadequate medical care; denial of medical care; use of excessive force; unlawful limitations on his right to file grievances; unconstitutional conditions of confinement; and denial of due process at a

---

[1] It is difficult to determine precisely how many defendants were actually sued. Some defendants were named twice, with variations in their names. For example, defendants Adams and Logston were both sued, but they are one person: Adam R. Logston. ECF 47, 59. Sgt. Brandon and Brandon Caple were both sued, but may be the same person. Some individuals are mentioned by plaintiff in his submissions as if they are defendants, but do not appear as defendants on the docket. *See*, *e.g.*, Officer Shawn Romesburg (whose surname is sometimes spelled by plaintiff as Romesburn; ECF 15-1 at 1, 2). CO II Toby Tasker was also sued, but the case was terminated as to him, pursuant to Wagner's request. *See* ECF 59. *See* Docket entry of 7/24/14.

Some defendants who were named apparently were never served, and service was not accepted for them, and there are virtually no allegations as to them. These include the following persons: Sgt. Daniel Meredith; Sgt. Deen Green; Fazenbaker, Jr.; Gomer; Michael E. Price; Crowe; J. Trasher; S. Koch; Nathaniel E. Passman, Jr.; Todd Merkel; Daniel N. Michael; C.O. Francis; Shoemaker; and Michael T. Baer. First names are not provided for Fazenberger, Jr.; Gomer; Shoemaker; Francis; Crowe; and Thrasher.

For the names of the defendants, *see generally* ECF 1, 15, 16, 17, 21, 22, 39, 55, 75.

disciplinary hearing.  *See* ECF 1, 15, 16, 17, 19.  Wagner's suit is supported by several affidavits. ECF 1-1; 13-1; 19-1.

In particular, Wagner has sued Wexford Health Sources, Inc. ("Wexford"); Colin Ottey, M.D.; Kristi Cortez, R.N.; Tiffany Bennett; Nurse Autumn Durst; Janice Gilmore; and William Beeman (collectively the "Medical Defendants").[2]   Plaintiff has also sued the following defendants:  Bobby Shearin, former Warden; John S. Beachy; Sgt. Jamie Farris; Dean W. Rounds, Jr.; Brandon R. Self; Leroy A. Conrad, II; Gary D. Maynard, former Secretary of DPSCS; Roderick Sowers, Director of DOC; Jesse Ballard, III; Keith Arnold, former Chief of Security; Cpl. Cinda Walker; Lt. William Gillium; Sgt. Janet Puffenbarger; Cpl. Justin Adams; Cpl. Gregory R. Shaffer; Cpl. Jesse L. Lambert, III; Sgt. Steven Roach; Sgt. Gregory Forney; Sgt. Jeremy J. Crites; Cpl. Matthew Engleson;[3] Sgt. Justin Gordon; Cpl. Jonathan Sharon; CO II Brian E. Fan[4]; Cpl. Troy Parsons; Sgt. Walter E. Iser, Sr.; Maj Thomas Mellot; Capt. Robert Friend; Maj. Carl Garland; Lt. George B. McCalpine; Chief of Security William S. Bohrer; Lt. Bradley Wilt; former DOC Commissioner J. Michael Stouffer; CO II Christopher Preston; R. Logston; Sgt. Brandon; Brandon S. Caple; Cpl. A. Preston; Cpl. Turner; and Maj. Presgraves (collectively, the State Defendants).

Counsel for the Medical Defendants have filed a motion to dismiss the complaint (ECF 44), to which Wagner has filed an opposition.  ECF 49.  The Medical Defendants have filed a

---

[2] Ms. Cortez's first name was incorrectly spelled as Cristy.  *See* ECF 44 at 1.  Wagner misspelled the last name of Tiffany "Bonnett."  ECF 17; her surname is "Bennett."  *See* ECF 44 at 1.

[3] Engleson's surname is also spelled as Eagleson in the State Defendants' filings.  *See, e.g.*, ECF 75-10.  Both spellings appear in this Memorandum.

[4] In counsel's entry of appearance, ECF 55, Fan is spelled as Fann.  Plaintiff has spelled CO II Fann's first name as "Brain."

reply. ECF 50.  The attorneys for the State Defendants have filed a motion to dismiss or, in the

alternative, for summary judgment.  ECF 75.  Wagner has not filed a response.[5]

The issues are ready for disposition.  No hearing is necessary to resolve them.  *See* Local

Rule 105.6 (D. Md. 2014).[6]

## I.   FACTUAL BACKGROUND[7]

### A.  Motion for Preliminary Injunctive Relief

On March 13, 2014, Wagner filed correspondence (ECF 1) and an affidavit (ECF 1-1)

alleging, *inter alia,* that he was assaulted by correctional officers on December 13, 2013, while

he was handcuffed.  Wagner explained that, as a result of what occurred on December 13, 2013,

he was afraid to "cuff up" and decided instead not to leave his cell.  ECF 1-1 at 1.[8]

On December 30, 2013, C.O. John Beachy came to plaintiff's cell and asked plaintiff if

he wanted to see Sgt. Caple.  ECF 1-1 at 1.  Although plaintiff said no, Caple came to plaintiff's

cell and told him "get ready than [sic] we coming."  *Id.*  Wagner states he "had words" with C.O.

Shawn Romesburg, who allegedly stated, "your little black ass really wanna die in that little

box."  *Id.* at 1-2.  Wagner asserts that he placed a sign in his cell window and prepared himself as

---

[5] Pursuant to the requirements of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), Wagner was notified of his right to respond and to file affidavits and records in reply to both dispositive motions.  ECF 46; ECF 76.

[6] On January 8, 2015, Wagner filed a motion to amend or correct the complaint.  ECF 73. The Medical Defendants filed an opposition (ECF 74), and on February 13, 2015, Wagner filed a motion to withdraw the motion to amend.  ECF 77.  Wagner's motion to withdraw (ECF 77) will be granted and his earlier motion to amend (ECF 73) will be dismissed as moot.

[7] Citations to page numbers are to those generated by the court's electronic case filing system, except for ECF 19-1 (Attachments) and ECF 75, Exhibits 1 and 2.  These exhibits were filed only in paper format, due to their length.

[8] Wagner's allegations and the response filed by the Maryland Attorney General are discussed in in the court's Memorandum of May 9, 2014 (ECF 9), which was filed with the Order denying preliminary injunctive relief.  *See* ECF 10.

he had been warned. An extraction team responded to Wagner's cell.  ECF 1-1 at 2.  Wagner states he was assaulted on December 31, 2013, and suffered an asthma attack, when the extraction team shot pepper balls and administered pepper spray.  ECF 1; 1-1.  According to Wagner, he was temporarily blinded, bled profusely, and left in his cell with the door shut.  Subsequently, he was photographed and taken for medical observation.

Wagner alleged that he was in immediate danger of serious harm. He also alleged that corrections staff members had given an unnamed member of a white supremacist group razers to harm him.

The court deemed Wagner's allegations sufficiently serious to construe his letter as a complaint and request for emergency injunctive relief.  Therefore, on March 18, 2014, I directed the Maryland Attorney General to file an expedited response, limited to these allegations.  ECF 2.  The court also indicated that, as to Wagner's claim that correctional officers used excessive force against him and his claim of unlawful disciplinary segregation, Wagner was to submit a prisoner civil rights complaint under 42 U.S.C. § 1983, using a form and instructions that the Clerk provided to Wagner.

Counsel for the Maryland Attorney General submitted an expedited response that included the Declaration of NBCI Correctional Case Manager John White (ECF 6-1) and extensive prison records to dispute Wagner's allegations of imminent danger.  ECF 6; ECF 6-1 at 3-43.  White averred that, to the best of his knowledge and based upon his review of prison records, Wagner was not injured, nor did staff members solicit anyone to harm him.  ECF 6-1 at 1 ¶ 7.  The records included the "Serious Incident Report" prepared after the incident on December 31, 2013.  ECF 6-1 at 3.

According to the submissions, on December 31, 2013, Romesburg ordered Wagner several times to come to the cell door and remove the sign covering from the cell window so that his well-being could be confirmed.  The sign said:  "I'm at peace with Lord, ready to die are you?"  ECF 6-1 at 5; *see* ECF 75, Ex. 1 at 313.  Wagner did not comply with the order, so a cell extraction team was assembled to check on Wagner.  The team entered the cell where they found Wagner with his arms wrapped from his wrists to his elbows with sheets and a pillow tied to his trunk. Wagner threw the contents of a milk carton filled with a liquid substance that smelled strongly of feces at the officers, striking Officers Preston and Crites on their bodies and faces. *Id*.  Officers Gordon, Romesburg, and Ritchie were struck in the arms and torso. Six rounds from a pepper ball launcher were fired, but they were ineffective against Wagner's makeshift body armor.  Wagner moved to the toilet in an attempt to fill another container, and a burst of pepper spray was administered.  After further refusal by Wagner to comply, he agreed to be handcuffed and was escorted to the medical room.  *Id*.

Wagner was treated for pepper spray exposure and bleeding from a "busted lip" caused by the pepper ball launcher.  Serious Incident Report, ECF 6-1 at 5; Medical Report, December 31, 2013, ECF 6-1 at 10.  The injury is described as a "superficial injury to lower lip."  ECF 6-1 at 10.  Wagner refused to sign a written statement of the incident.  Wagner also refused a decontamination shower and was placed on suicide precautions.  The Internal Investigation Unit ("IID") was notified of the incident.

The following day, January 1, 2014, Wagner was found in his cell with his face in a small amount of blood and had difficulty keeping his eyes open.  ECF 6-1 at 5, 12, 14.  The medical report reads: "No source can be determined for blood found in cell."  ECF 6-1 at 12.  Wagner was transferred to the infirmary and for suicide observation.  ECF 6-1 at 14.  Prison records

show Wagner received or was offered medical, dental, and mental health treatment, showers, and out-of-cell activity since the incident, and has remained in segregation confinement.

Based on the above, I concluded that Wagner had not shown the likelihood of imminent, irreparable harm and failed to satisfy the standard for preliminary injunctive relief set forth in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 19 (2008). Therefore, on May 9, 2014, I denied preliminary injunctive relief. ECF 9, 10. Wagner was granted twenty-eight days to indicate whether he wished to pursue his claims. *Id.*

### B. Wagner's Complaint, as Supplemented

On May 14, 2015, Wagner indicated his intent to pursue claims by submitting three related supplementary filings on court provided forms for filing a civil rights complaint pursuant to 42 U.S.C. § 1983. *See* ECF 15, 16, 17. On July 18, 2014, Wagner submitted his Declaration and that of other inmates in support of these claims. ECF 19, 29.

In the complaint, as supplemented, Wagner raises claims of excessive force, unconstitutional conditions of confinement, violation of due process, denial of medical treatment, inadequate medical treatment, and denial of access to the administrative remedy process. The allegations arise from four incidents that occurred on the following dates: October 31 2013; December 13, 2013; December 31, 2013; and January 1, 2014. As redress, Wagner seeks damages of an unstated sum and asks this court to order: 1) his transfer to another region pending Interstate Corrections Compact[9] transfer and 2) an "outside" medical examination to address his "repetitive vomiting of blood" and pain medication. ECF 15 at 11; ECF 16 at 10; ECF 17 at 4, 9. Wagner's allegations are summarized below.

---

[9] The Interstate Corrections Compact enables participating states to enter into agreements for cooperative care, treatment, and housing of offenders sentenced to or confined in prisons and other correctional institutions. Maryland is a participant in the Compact. *See* Md. Code, Corr. Serv. §§ 8-601-611.

### 1.  Incident on October 31, 2013

Wagner claims that because he was accused of inciting a riot, he was "brutally attacked" on October 31, 2013, by defendants Cpl. Brandon Self and Cpl. John Beachy.  ECF 15; *see also* ECF 15-1 (Affidavit of Wagner).  Wagner claims Beachy and Self "kicked, punched and kneed" him.  ECF 15 at 8.  Wagner's teeth were chipped, he was "slammed," and his arm was bent by Sgt. Farris, Self, and Beachy.  *Id*.  Wagner also claims that his left shoulder was dislocated, his eye was cut, and his nose was "busted" by defendants Farris, Self, and Beachy**.**  *Id*.  In addition, Wagner asserts that defendants Cpl. Leroy Conrad, III; Cpl. Dean Rounds, Jr.; and Sgt. William Gillium attacked him.  Gillium squeezed his larynx until Wagner lost consciousness.  *Id*. at 8-9.  Wagner was then dragged into a contingency cell where he was "repeatedly attacked" by Gillium, Farris, Beachy, Self, Conrad, and Rounds, Jr.  *Id*. at 9.  Wagner claims he remained handcuffed throughout the attack, with a leash connected to the cuffs, and spit up dark red blood.  Conrad and Gillium pulled on the leash while Conrad applied a thumb lock grip to Wagner's right thumb.  *Id*.  Wagner believes his thumb was broken as a result.  Gillium then "snatched the remaining cuff off without uncuffing it which tore skin from [Wagner's] wrist/hand also injuring [his] wrist and pinkie finger, *i.e.*, severely spraining it requiring a brace and x-rays."  *Id*.

According to Wagner, he was placed in a cold cell without a mattress, linen, toiletries, or running water.  Feces and urine covered the floor.  The cell window was locked from the outside and he received a food bag only on November 2 and 3, 2013.  ECF 15 at 9.  Wagner asserts that he continued to "vomit blood internally," without treatment, and his clothing was taken.  *Id*.  He also claims that he was refused forms to file a grievance ("ARP"), and was denied sick call slips, and "no report according to information and belief was ever made."  *Id*.

Wagner alleges that he was continuously denied treatment whenever a nurse walked

around the tier.  *Id.*  On November 6, 2013, a nurse checked his vital signs but did not provide treatment.  *Id.*  Indeed, Wagner claims he was refused medical treatment until November 16, 2013. *Id.*

### 2.  Incident on December 13, 2013

Wagner claims that on December 13, 2013, he was assaulted by defendants Cpl. Gregory Shaffer; Cpl. Adams Logston; Cpl. Jesse Lambert, III; and Sgt. Steven Roach.  According to Wagner, the assault was in retaliation for his filing a grievance against Warden Shearin on December 12 and 13 of 2013.  ECF 16 at 4.  Wagner explains that he had a medical order for hand-cuffing in the front, which Shaffer refused to honor.  Wagner was placed in handcuffs and his arm and wrist were "twisted," he was forced to his knees, and his "head [was] slammed to the concrete."  *Id.*  Wagner asserts he was denied medical treatment for his head and his legs were skinned by the concrete.  *Id*. at 4.

Wagner claims he requested ARP forms and defendant Roach refused to address the situation.  *Id.*  Wagner states that neither Roach nor Lambert assaulted him, but they did not do anything to prevent the assault and they did not file a report.  According to Wagner, he "got a grievance slip from [his] neighbor and wrote the incident up," but it was dismissed, without investigation, along with the ARPs he had filed against Shearin.  *Id*. at 5.

Wagner complains that on December 13, 2013, Shearin restricted him to filing three grievances per month, and Commissioner Sowers (of the Division of Correction), approved the restriction.  Wagner posits that this "took away the only little safety I had…."  *Id.*

### 3.  Incident on December 31, 2013

Wagner alleges that because he filed a grievance against Warden Shearin, the Warden ordered defendants Sgt. J. Gordon; Sgt. G. Forney; Sgt. Steven Roach; Cpl. Jermy [sic] Crites;

Cpl. Engleson; Cpl. Christopher Preston, and others to unlawfully extract Wagner from his cell on December 31, 2013. ECF 1; ECF 16. He reiterates, in more detail, his allegations of excessive force, first presented in his initial filing. ECF 1; ECF 16 at 10-11. Wagner claims that he was extracted from his cell and assaulted with riot weapons. ECF 16, at 10. He alleges that he was shot with a pepper ball gun, rubber bullets, and OC gas[10] and left to bleed and choke for 12 to 16 minutes, during which time he had an asthma attack. *Id.* at 10. Wagner was lifted from the floor and dropped several times, which dislocated his shoulder. ECF 29 (Declaration of Wagner) at 2. He also claims he never received treatment. ECF 16 at 10.

Wagner acknowledges that there was a written sign in his cell, but states Officer Romesburg continuously taunted him by banging on his door, "irritatingly flicking his light" and "making threats toward" Wagner, such as "your little black ass really wanna die in that little box." ECF 13 at 4. Wagner states that he responded as follows: "I'm at peace with my Lord & ready to die are you." *Id.* He concedes his comment "may have been hasty in form" but denies that it required an extraction team. *Id.* In his view, the assembly of the extraction team was a ruse. *Id.* at 4-5. He also suggests that his use of makeshift body armor was "exaggerated," but concedes that "there were milk and juice cartons lining [the] overhead of [his] cell door situated to come down should the door open." *Id.* at 5. And *see* ECF 13-1 (Declaration of Wagner).

Wagner was taken to the medical unit. He maintains that Nurse Cortez was "very unprofessional" and "joked and laughed" with defendants Crites and Gordon. ECF 16 at 11. He also claims that Gordon told Cortez that Wagner was not injured and told her what to write on the medical report, even though Wagner was "right in front of her" and was "bleeding profusely

---

[10] Oleoresin Capsicum ("OC") spray is a chemical agent similar to what is commonly known as pepper spray or mace and irritates a person's eyes, throat, and nose. *See, e.g., Park v. Shiflett,* 250 F.3d 843, 849 (4th Cir. 2001) (describing the physiological effects of OC spray).

and clearly having a difficult time breathing." *Id.*

Wagner was next taken to "the cage area by property," where he was subjected to "a minor assault consisting of arm twisting, shoving, strikes to the head, and face with an open hand, by Sgt. Gordon, and threats took place." *Id.* at 11-12; *see* ECF 29 at 2-3. Wagner was stripped to his underwear and taken to a contingency cell but was not permitted to decontaminate. ECF 16 at 12. The water in the cell "was ordered to be turned off" by Gordon. *Id.*

### 4. January 1, 2014 Incident

Wagner alleges a second cell extraction occurred on January 1, 2014. ECF 16 at 12. Wagner's allegations concerning an incident on January 1, 2014, are difficult to follow because at times they closely mirror his allegations concerning the cell extraction that occurred on December 31, 2014. He submitted, *inter alia,* the declarations of Ericky Bogues, dated January 30, 2014, and Matthew Oakes, also dated January 30, 2014. *See* ECF 19-Attachments. They suggest an incident occurred on January 1, 2014. The State Defendants maintain that a cell extraction incident did not occur on January 1, 2014 (ECF 74, n.3; *see also* ECF 75-2, Ex. 1 at 214 (stating there are no incidents reported involving Wagner on January 1, 2014). But, the State Defendants did not file any declarations specifically denying Wagner's allegations concerning an incident on January 1, 2014.

Wagner avers that he was threatened by Engleson, who told him "Get Ready For Us!" ECF 16 at 12. According to Wagner, defendants Gordon, Forney, Roach, Crites, Sharon, Preston, and Engleson stood outside his cell. Sgt. Gordon used a racially derogative term, *id.*, and stated loudly a few times that Wagner was "unresponsive." *Id.* Wagner claims the officers were all "smiling sinisterly" while Wagner "yelled out loudly" and repeated: "I'm not

unresponsive…." *Id*. at 13.

Gordon readied the extraction team while Wagner shouted: "I'm not doing anything, leave me alone 'PLEASE.'" *Id*. The cell door opened and Wagner was hit with a shield, "rendering [him] helpless and defenseless." *Id*. Wagner's legs were "snatched from under," *id.*, and his head and neck hit the heating vent. ECF 16 at 13-14. Sharon and Engleson sprayed Wagner in the face as Wagner was repeatedly kicked in the chest, stomach, head, and back. *Id*. at 14. Crites then stood over Wagner and "fired numerous shots to [his] body." *Id*. at 14. At the time, Wagner was clad only in boxer shorts. *Id*. Engleson said: "Look at the nigger move." *Id*. Wagner recalls that he was "curled in a somewhat fetal position" and Preston and Sharon kicked him "so hard [that] a pool of blood came out [of his] mouth and nose. . . ." ECF 16 at 14. Wagner states his nose was "already busted" by Gordon. *Id*. Forney stated: "'The bastard is fuckin puking blood'. . . ." *Id*. Sharon punched Wagner "in the face and gut," *id.*, causing him to spit out more blood. *Id*. Engleson and Sharon bent and twisted his arms and cut off a wrist brace and deliberately bent his injured wrist. ECF 16 at 15. Wagner was given a prison jumper to wear, and Engelson and Sharon "dragg[ed]" him to the medical unit. *Id*. at 15. Wagner was bloody and his nose was still bleeding. *Id*. Three nurses "did nothing to stop this brutal attack" and two of them "laughed and joked" with Gordon, Forney, and Crites. *Id*. at 15. Wagner also claims that "Gordon told the nurses what to write. . . ." *Id*.

Wagner was then was taken to a 2x2 cage in the property area where he was "stripped" by Gordon and held by Sharon and Engleson, who slammed his face into the cage. *Id*. at 16. Sharon also kicked Wagner's legs with his boots. *Id*. Wagner's picture was taken and he sarcastically commented "'all this for a supposed unresponsive inmate huh.'" *Id*. at 16. Crites answered: "'Nigger, I should kill you getting shit (feces) on me last night.'" *Id*. Gordon asked

11

Wagner whether he thought he was "gone [sic] get away with last night?"  *Id*.  Wagner replied that Engelson had not been there the previous night, to which Engleson stated: "'I just hate nigger's [sic] I'm racist if I had my way I'd kill all you niggers.'"  *Id*.

Wagner states that, as he was being transferred to the special housing unit ("S.O.H.") at Western Correctional Institution ("WCI"), and "after being called as many coons and niggers I could take," he stated to Sgt. Gordon "'Fuck you KKK'…."  ECF 16 at 16.  Crites then "sucker punched" Wagner in the right eye.  *Id*.  His eye split open and swelled so that it was partially shut.  Wagner's "toe was stomped on invidiously" and he felt a "very sharp pain and snap sound…."  ECF 16 at 16.  Wagner believes the toe was fractured, but he has not received x-rays or pain treatment.  *Id*.

Plaintiff also avers that his back was injured and "it took more than 2 months of complaining before [he] was seen" for medical treatment.  *Id*.  He complains that he was told it was "only minor nerve damage and inflammation," *id.* at 16-17, and was denied an MRI or an examination by a neurologist to "avoid cost and to cover up the drub [he] suffered in an attempt to minimize the assault or [his] injuries."  ECF 16 at 17.

On January 2, 2014, after protesting and refusing to return to NBCI for "fear of [his] life," someone from NBCI "deceived the officers at WCI and informed them" that the IU [11] would meet with Wagner upon his return to NBCI.  *Id*. at 17.  Upon Wagner's return to NBCI, Cpl. Toby Tasker; Brain [sic] Fan; Conrad, Caple, and unnamed others ordered Lt. Bradley Wilt to strip Wagner naked and place him in cell 1-C-20.  *Id*.  Wagner was "pretty much carried down the tier as [he] could not walk."  *Id*.  The cell had no mattress, linen, toilet paper, or running water.  *Id*.  Wagner claims he was denied food, ARP forms, sick call forms, an

---

[11]  The court assumes Wagner means the Internal Investigation Division ("IID").

opportunity to speak with the "IU" or to make a statement, and was denied his mail.  *Id*.  He remained in this status from December 31, 2013, until January 30, 2014.  *Id*.

Wagner also claims that Preston, Shaffer, and Gordon "play[ed] with [his] food."  *Id*. Crowe Turner, Parsons, and others also played with his food and denied him meals.  *Id*.  Preston often asked Wagner "how does his pubic hairs taste," ECF 16 at 18, and officers "would sling [Wagner's food] tray on the floor."  *Id*.  According to Wagner, Cpl. Francis threw Wagner's meal in urine and feces after another inmate flooded the bottom tier with it.  In addition, he alleges that Engleson "tampered with" Wagner's food.  *Id.* at 19.

Wagner asserts:  "All the cells on the bottom tier was cleaned by blood spill except mine."  ECF 16 at 18.  Wagner had to have others "fish" him soap powder and water in a bag so he could try to clean up.  *Id.* at 16.

Further, Wagner alleges that he was handcuffed behind his back (despite a medical order for front cuffing) when he was placed in the "2 x 2 cage."  *Id.* at 18.  He received a sleeveless smock to wear, which "came just pass [sic] the waist…."  ECF 16 at 18.  In addition, on January 30, 2014, he had his first shower since December 30, 2013.  *Id.*  And, when he exited the shower, he discovered that various ARPs, letters, and other materials, such as political literature, books, and newspapers, were missing.  *Id.*[12]

Wagner claims he obtained grievance forms from other inmates on January 31, 2014, and

---

[12] To the extent Wagner seeks to state a claim of property loss under § 1983, it is not actionable. In the case of lost or stolen property, sufficient due process is afforded to a prisoner if he has access to an adequate post-deprivation remedy. *See Parratt v. Taylor*, 451 U.S. 527, 542–44 (1981), overruled on other grounds by *Daniels v. Williams*, 474 U.S. 327 (1986). Plaintiff may avail himself of remedies under the Maryland Tort Claims Act and through the Inmate Grievance Office. The right to seek damages and injunctive relief in Maryland courts constitutes an adequate post deprivation remedy. *See Juncker v. Tinney*, 549 F.Supp. 574, 579 (D.Md. 1982) (sufficient due process afforded through post deprivation remedies available in the Maryland courts for personal injury matters).

"wrote up" the incident, but never received a confirmation copy.  He alleges that inmates on the 1-C wing were denied access to the grievance process for three months. *Id*. at 19. He also submitted an ARP, forwarded a copy to the Commissioner, and received no response. *Id*. at 18.

According to Wagner, on February 18, 2014, and March 28, 2014, Crites threatened Wagner's life.  ECF 16 at 19.[13]  Further, he alleges that Engleson has twice solicited an Aryan Brotherhood member to harm him.  *Id*.  As noted, Wagner has submitted several declarations, one of which is from Raymond Hurt, a NBCI inmate.  He attests: "[O]n a day not remembered during the month of February CO. Eadeson [sic] made a request for me to fuck the nigger in 20 up…."  ECF 19 - attachment.[14]  The State Defendants' response is silent as to these particular allegations.[15]  And, Wagner claims Corporal Marchinke[16] and defendant Rounds took his medical pass on an unspecified date because he would "'not shut up'" and no medical personnel addressed him although they were aware of Wagner's "serious need to be seen."  ECF 17 at 6.

### 5.  Due Process

Wagner complains that he received an infraction for violating Rule 101 for assaulting a staff member during the extraction.  ECF 16 at 19.  Wagner claims he was denied due process because he never received notice of the infraction charge, nor was he given a chance to represent

---

[13] Wagner does not particularize the nature of the alleged threat nor does he aver Crites acted to execute the threats. Without more, this allegation does not state a claim on which relief may be granted.  An officer's verbal threats alone do not violate an inmate's constitutional rights. *See Emmons v. McLaughlin*, 874 F.2d 351, 354 (6th Cir.1989) (verbal threats causing fear for plaintiff's life not an infringement of a constitutional right); *Henslee v. Lewis*, 153 F. App'x 178, 180 (4th Cir. 2005) (affirming dismissal of claim based on threats); *see also Carter v. Morris*, 164 F.3d 215, 219 n. 3 (4th Cir.1999).

[14] As indicated, the exhibits attached to ECF 19 are not filed on the electronic docket.

[15] Because the State Defendants were silent as to this contention, summary judgment will be denied as to this claim.  *See* page 70, *infra*.

[16] Marchinke is not named as a party in this case.

himself or have witnesses testify on his behalf at the hearing.  He claims the failure to provide notice was an attempt by defendants "to cover up their attack."  *Id.*

### 6.   Medical Treatment

As indicated above, Wagner alleges that he was injured on October 31, 2013, after he was subjected to excessive force, and he complains that he was refused medical treatment until November 16, 2013. He acknowledges that he was sent for x-rays on November 8, 2013.  And, on November 16, 2013, Colin Ottey, M.D., saw him and prescribed muscle rub and a wrist/hand brace.  ECF 17 at 4.  Wagner states he vomited blood for weeks and remained in excruciating pain.  ECF 17 at 5.  He states that he believes his thumb is still broken.  *Id.*

Further, Wagner claims that he was assaulted by correctional officers on December 13, 2013, and sustained a "busted head" and skinned knees and shins.  *Id*. at 4.  Wagner alleges that on December 31, 2013 and January 1, 2014, he suffered an eye injury that has caused him to lose his vision.  *Id*. at 5-6.  Wagner faults "three nurses" in the medical unit for doing nothing to stop the attack on him.[17]  ECF 16 at 15.  Gordon instructed Nurse Cortez not to document his injuries even though he was having a difficult time breathing and was bleeding profusely. *Id.* at 11, 15.  Notably, Wagner does not allege Cortez followed his instructions. Wagner claims, however, that he was denied medical treatment after the alleged assault. ECF 16 at 4-5.

According to Wagner, he has minor nerve damage to his back that causes him to lose feeling and motion in his left leg.  ECF 17 at 5.  Wagner also states he continued to vomit blood for weeks and remained in excruciating pain.  *Id*.  In addition, he believes his thumb is still broken.  *Id.*  Wagner cannot walk without pain.  Sleeping and bathroom use are unbearable due to the severity of his pain.  *Id*; *see also* ECF 29 at 3.

---

[17] It is unclear whether Wagner is referring to the incident on December 31, 2013, or January 1, 2014.

Wagner states he was seen by an eye doctor and dentist concerning his injuries.  ECF 17 at 6.[18]  He was told glasses would improve his vision, but he has not received glasses.  Nor has he been given any medication for the pain he suffers from his damaged eye and teeth.

On March 21, 2014, Wagner's leg "gave out" and he fell and struck his head on the side of his bunk.  Nurse Autumn Durst refused to treat him.  Durst and other nurses walked by him when they were on his tier.  *Id*. at 6.  He had a "large golf  ball size knot" on his head that he showed to Cortez and Durst and they walked away from his cell.  *Id*.  Wagner claims he has filed sick call slips that were ignored.  *Id*. at 7.  He alleges that he vomited blood until April 3, 2014, and was continuously denied medical treatment from the nurse.  ECF 15 at 9.  He claims to have problems showering because he is unable to stand and properly wash due to his inability to bend, lift his legs, or to stand on his left leg.  ECF  29 at 5.[19]

Additional facts are included below.

### III. MEDICAL DEFENDANTS' MOTION TO DISMISS

#### A.  Standard of Review

The Medical Defendants have moved for dismissal of the claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  ECF 44.  A motion to dismiss pursuant to Rule 12(b)(6) tests the adequacy of a complaint.  *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  Such a motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which

---

[18] It is unclear whether the ophthalmic and dental  reports are part of the record.  *See*, *e.g*., ECF 75-2, Ex. 2 at 179-80.

[19] Wagner also alleges he has suffered from racial and "political" discrimination. ECF 1-1 at 8.  However, he does not allege, nor do the facts suggest, that the Medical Defendants have acted with unlawful discriminatory animus against him so as to state a claim of discrimination. Accordingly, this claim will be dismissed, pursuant to Fed. R.12(b)(6).

relief can be granted." Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed.R.Civ.P. 8(a)(2). Rule 8 provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 n. 3 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Generally, a court's consideration of a Rule 12(b)(6) motion is confined to facts alleged in the operative pleading. A court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013). But, a court may properly consider documents "attached or incorporated into the complaint," as well as documents attached to the defendant's motion, "so long as they are integral to the complaint and authentic." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *see also Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *E .I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011). To be "integral," a document must be one "that by its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.' " *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original); *see also New Beckley Mining Corp. v. UMWA*, 18 F.3d 1161, 1164 (4th Cir. 1994) (holding district court did not err in relying on document that plaintiff referred to in its complaint to justify cause of action).

A plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a

complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, ⸺ U.S. ⸺, 135 S.Ct. 346, 346 (2014) (per curiam). But, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). To satisfy the minimal requirements of Rule 8(a) (2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if ... [the] actual proof of those facts is improbable and ... recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. In other words, the complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id*. at 570; *see Iqbal*, 556 U.S. at 684; *Simmons v. United Mortg. & Loan Inv., LLC,* 634 F.3d 754, 768 (4th Cir. 2011).

In reviewing a Rule 12(b)(6) a motion, a court " 'must accept as true all of the factual allegations contained in the complaint,' " and must " 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co*., 637 F.3d at 440 (citations omitted); *see Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir.), *cert. denied*, ___ U.S. ___, 132 S.Ct. 402 (2011); *Monroe v. City of Charlottesville*, 579 F.3d 380, 385–86 (4th Cir. 2009), *cert. denied*, 559 U.S. 991 (2010).   However, a complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient. *Twombly*, 550 U.S. at 555.  Moreover, the court is not required to accept legal conclusions drawn from the facts.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe*, 579 F.3d at 385–86.

A Rule 12(b)(6) motion will be granted if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679 (citation omitted). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining

whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without A Name v. Virginia,* 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S.Ct. 1960 (2012).   "'Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.'"  *Hartmann v. Calif. Dept. of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (citation omitted); *accord Commonwealth Prop. Advocates, LLC v. Mortg.* Elec. Reg. Sys., Inc., 680 F.3d 1194, 1201–02 (10th Cir. 2011) ("Dismissal is appropriate if the law simply affords no relief.").

A motion asserting failure to state a claim typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Edwards*, 178 F.3d at 243 (quotation marks omitted), unless such a defense can be resolved on the basis of the facts alleged in the complaint. *See Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir.2007) (*en banc*).  "This principle only applies, however, if all facts necessary to the affirmative defense 'clearly appear [ ] on the face of the complaint,'" or in other documents that are proper subjects of consideration under Rule 12(b)(6). *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*).

### B.  Inadequate Medical Treatment

The Eighth Amendment proscribes "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).[20]  "Scrutiny under the Eighth Amendment is not limited to those punishments

---

[20] To the extent Wagner also brings his claims under the Fourteenth Amendment (ECF 17 at 8), the constitutional protections afforded a pretrial detainee as provided by the Fourteenth Amendment are co-extensive with those provided by the Eighth Amendment.  *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979).  However, there is no indication in the record that Wagner was a pretrial detainee during the times at issue in this case.

authorized by statute and imposed by a criminal judgment." *DeLonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or ensure the needed care was available. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). As the Fourth Circuit recently explained in *Lightsey*, 775 F.3d at 178, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference."

Therefore, "[t]o show an Eighth Amendment violation, it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178. The Fourth Circuit has characterized this as an "exacting standard. . . ." *Id.* Moreover, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340,

346 n.8 (4th Cir. 2014).

As noted above, objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce,* 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment." *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer,* 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998)) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

Of course, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Brice*, 58 F.3d at 105; *see Makdessi v. Fields*, ____ F.3d ____, No. 13-7606, slip op. at 14 (4th Cir. March 12, 2015). And, "[a] prison official's subjective actual knowledge [of a risk] can be proven through circumstantial evidence. . . ." *Makdessi*, slip op. at 15.

Of import here, "[a] prisoner's disagreement with medical providers about the proper course of treatment does not establish an Eighth Amendment violation absent exceptional circumstances." *Lopez v. Green*, 2012 WL 1999868, at *2-3 (D. Md. June 4, 2012) (citing *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)); *see Wester Jones*, 554 F.2d 1285 (4th Cir. 1979). Moreover, "any negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F. 3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id*. at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge).

And, prison officials are entitled to rely on medical judgments and the expertise of prison physicians and other medical providers concerning the course of treatment deemed necessary for prisoners. *See Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995); *see also Miltier v. Beorn*, 896 F.2d 848, 854–55 (4th Cir. 1990) (stating that supervisory prison officials are entitled to rely on professional judgment of trained medical personnel and may be found to have been deliberately indifferent by intentionally interfering with a prisoner's medical treatment ordered by such personnel). Moreover, the right to medical treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977).

The Medical Defendants seek dismissal of the claims against them, arguing that the facts alleged do not establish deliberate indifference to a serious medical need. They posit that Wagner's claims fail as a matter of law. Alternatively, they argue that they are entitled to

qualified immunity because their alleged behavior does not violate clearly established statutory or constitutional rights.  ECF 44 at 1.

The Medical Defendants correctly observe that Wagner fails to make any allegations against defendants Bennett, Gilmore, or Beeman.  ECF 44 at 19.  As such, these three defendants are entitled to dismissal from this case.

The remaining Medical Defendants cite the care Wagner has received, including muscle rub, x-rays, a wrist brace, and visits with an eye doctor and dentist, to refute his allegations that they acted with deliberate indifference to his serious medical needs.  *Id*. at 11.  They observe that Wagner does not allege that Nurse Cortez followed Sgt. Gordon's alleged directions concerning how to document Wagner's injuries on December 31, 2013.  Further, they posit that Wagner has failed to allege any specific injury sustained as a result of the alleged failure to receive additional treatments.  *Id*. at. 15.

The Medical Defendants seem to overlook that, in Wagner's Declaration accompanying his reply, ECF 49-1 at 4, Wagner avers that Gordon "not only told RN Cortez not to document my injuries, but he was dictating to her what to write.  It's obvious to me that she did as told because I could clearly see the computer screen and saw that she in fact 'did not' document my injuries as described by me or as undoubtedly were apparent to her and any lay person."  *Id*.

Accepting Wagner's various factual allegations as true, and drawing all reasonable inferences from those facts in favor of plaintiff, as this court must when considering a motion to dismiss, plaintiff alleges that: 1) Nurses Cortez and Durst failed to stop at his cell during their cell checks, despite his entreaties; 2) the nurses failed to inspect a "knot" on his forehead; 3) Cortez did not accurately document his injuries after the incident of December 31, 2013, at the behest of defendant Gordon; 4) Wagner received no medical attention after the incident of

October 31, 2013, until November 6, 2013, when his vital signs were taken, and he did not receive a more complete medical evaluation until November 16, 2013, at which time he was sent for x-rays; 5) his numerous sick call slips went unanswered;[21] 6) he has sustained painful injuries to his teeth, finger, shoulder, and eye; and 7) he is unable to stand properly and cannot bend or lift his legs.

These allegations are sufficient to state a claim for an Eighth Amendment violation based on inadequate medical treatment. Given Wagner's allegations of fact, dismissal of the claims against medical providers Kristi Cortez, Autumn Durst, Colin Ottey, M.D., and Wexford for failure to state a claim pursuant to Rule 12(B)(6) is not appropriate.[22]

Accordingly, the Medical Defendants' Motion to Dismiss (ECF 44) will be granted in part and denied in part.  The Motion to Dismiss (ECF 44) will be granted as to defendants Gilmore, Beeman, and Bennett, and denied as to defendants Cortez, Durst, Ottey, and Wexford.

## IV.  STATE DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

### A.  Standard of Review

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  The motion is supported by many exhibits, containing hundreds of pages.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol.*

---

[21]  *See*, *e.g.*, ECF 17 at 17.

[22]  The Medical Defendants rely on *Filarsky v. Delia*, ___ U.S. ___, 132 S. Ct. 1657, 1667–68 (2012), to support their qualified immunity defense.  ECF 44 at 16.  Filarsky overturned the denial of qualified immunity to an attorney who was retained by a city in California to assist in an internal investigation concerning a firefighter's potential wrongdoing.  *Id*. at 1666.  The Medical Defendants fail to demonstrate that *Filarsky* has been extended to contractual health care providers working in detention centers or correctional facilities.

*Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442 450 (2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).  When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[23]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

---

[23] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure

to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

I am satisfied that it is appropriate to address the State Defendant's motion as one for summary judgment. Notably, both sides have addressed the issues and have submitted many exhibits. Moreover, to do so will facilitate resolution of the case.

Summary judgment is governed by Fed. R. Civ. P. 56(a). It provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith, Radio Corp.*, 475 U.S. 574, 586 (1986).

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some*

alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012).

"A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of [his] pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). However, the court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, __ F.3d ___, No. 13-2212, slip op. at 12 (4th Cir. March 12, 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Indeed, in the face of conflicting evidence, such as competing affidavits, summary

judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See*, *e.g.*, *Boone v. Stallings*, 583 Fed. App'x. 174 (4th Cir. 2014) (per curiam).

However, to defeat summary judgment, conflicting evidence must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248. *See Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the " 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## B. State Defendants' Response

In support of their Motion to Dismiss, or in the Alternative for Summary Judgment, the State Defendants have filed verified prison and medical records, IID investigation reports of the incidents of October 31, 2013 and December 31, 2013, Wagner's medical records, and the declarations of eight correctional officers. They have divided the State Defendants into two categories: "front line correctional officers who have dealt directly with the plaintiff, and senior

or supervisory officials who have had little or no direct contact with the plaintiff." ECF 75-1 at 2.

### 1. Reports and Prison Records

Wagner is serving a life sentence for first-degree murder, armed robbery, and second-degree assault, and is a validated member of the Security Threat Group, Black Guerilla Family. ECF 75, Ex. 2 at 224.[24]  John White, the Inmate Grievance Office ("IGO") Coordinator at NBCI, states in his Declaration, ¶ 6, that Wagner is a "High Profile inmate" who is "considered very dangerous, has threatened correctional staff on multiple occasions, and is frequently uncooperative and hostile." ECF 75, Ex. 1.  Wagner's "actions and demeanor regularly presents [sic] dangerous situations" that correctional officers must address.  *Id.* at ¶ 6.

White has certified to the accuracy of the exhibits provided by the State Defendants.  *Id.* ¶ 5.  Moreover, he avers that the records demonstrate that Wagner's safety has not been compromised; he remains in a single-cell; the Staff have not solicited anyone to harm Wagner; and Wagner is provided "regular access" to medical and dental care.  *Id.* ¶ 7.

### a. September 8, 2013, Infraction Report

On September 8, 2013, Lt. Bradley Wilt prepared an infraction report based on events arising from a hunger strike organized by Wagner that escalated the level of tension on his tier. ECF 75, Ex. 1 at 2, 7. Wagner refused to sign the receipt for the rule violation notice.  *Id.* at 2. He was subsequently found guilty of being disruptive to the operation of the institution and his poor adjustment history was noted.  *Id.* at 6-8.  At the adjustment hearing held at NBCI on October 31, 2013, Wagner became disruptive and had to be removed from the proceeding.  *Id.* at 73.  On November 1, 2013, Wagner refused to sign the notice of the decision.  *Id.* at 10.

---

[24] As noted, ECF 75, Exhibits 1 and 2, were filed only in paper format, due to their length.

### b. Investigation Department (IID) Report IID-13-35-1505 pertaining to the October 31, 2013, incident

Report IID-13-35-1505 was prepared after the completion of an IID investigation prompted by Wagner's ARP claiming he was subjected to the use of excessive force on October 31, 2013, by Officers Cinda Walter, Jeanine "Jamie" Harris, and John Beachy. Ms. Harris has not been named as a defendant. Moreover, throughout the investigation itself, the substance of the submissions refer to Sergeant Jamie Farris, not Jeanine Harris. *See, e.g.,* ECF 75, Ex. 1 at 72-76. The State does not explain the confusion. But, because Farris, not Harris, was sued, I will assume that the reference to Harris is an error. ECF 75, Ex. 1 at  65, 66, 78-79. IID investigator Captain Gregory Werner conducted the inquiry.

As noted earlier, on October 31, 2013, Wagner attended an adjustment hearing. ECF 75, Ex. 1 at 73. Wagner told the IID investigator that as he was expressing disagreement with the sanctions imposed at his adjustment hearing on October 31, 2013, defendants Cinda Walker and Jamie Farris lifted his seat and forcefully escorted him from the room. As they were exiting, Walker pulled her pepper spray and struck Wagner on the left side of the head,  while Farris "jumped him. . . ." *Id.* Beachy and Self arrived and kicked Wagner and slammed his face to the floor, dislocating his shoulder, causing his teeth to chip, and causing a "knot" on his forehead. *Id.* Wagner also injured his hand and coughed blood. *Id*. at 73, 78-79. He was choked as he was dragged to Cell 1-C-3O, and assaulted inside the cell. *Id*. at 73. His arms were pulled through the door slot, one handcuff was removed, and the second was pulled off of his hand without being unlocked. *Id.*

Officer Cinda Walker told the investigator that Wagner became verbally abusive to the hearing examiner at the conclusion of the hearing. She advised Wagner that it was time to leave. She placed her hand on Wagner's arm to escort him and he stood up, at which time Farris began

assisting with the other arm for escort.  *Id.* at 74.  Wagner resisted the escort, and as they exited the room, Walker lost her grip on Wagner.  Beachy, who was in the area, took over the escort. Walker followed the escort to the Temporary Housing Cell and Wagner was secured.  *Id.* Walker stated she never assaulted Wagner, nor did she witness anyone else assault him.  *Id*.

Sergeant Jamie Farris told the investigator that Wagner was verbally disrespectful to the hearing officer at the conclusion of the hearing on October 31, 2013. Walker had advised Wagner it was time to leave. Farris assisted Walker in escorting Wagner from the hearing room. As they walked through the doorway, Walker lost her grip on Wagner.  Beachy, who was walking by the area, then assisted with the escort. Farris and Beachy escorted Wagner to a temporary housing cell where Wagner was secured. Farris stated that he never assaulted Wagner or saw anyone else assault him. *Id.*

Officer Brandon Self told the investigator that on October 31, 2013, he was returning inmate workers to their housing units at the time of the incident. Self stated that he had no involvement with Wagner. *Id*.

Officer John Beachy told the investigator that, as he was walking through the housing unit hallway, he heard activity in the hearing room. Farris and Walker came through the hearing room door with Wagner.  At the time, Wagner was resisting the escort.  Beachy dropped the mail he was carrying in order to assist Farris, because Walker had lost her grip on Wagner.  Beacher and Farris escorted Wagner to a temporary housing cell and secured him.  *Id*.

The IID investigator also reviewed the medical records and video footage of the incident. *Id*. at 73. The medical record, dated November 6, 2013, indicates that Wagner had three superficial scratches behind his ear.  *Id.* at 128.  No cracked or chipped teeth were observed.  *Id*. X-rays were taken of Wagner's right hand and chest on November 11, 2013.  No fractures or

dislocations were found. *Id.* at 129, 132.

Based on the evidence, the investigator determined: 1) staff interviews established Wagner was resistant to escort; 2) there was no medical evidence to support Wagner's claim that he was assaulted, slammed on the floor, or had a resulting "knot" on his forehead or chipped teeth; 3) staff interviews refuted Wagner's claims; 4) video footage refuted Wagner's claim that he was dragged to the temporary housing cell.; and 5) staff reports, medical reports, and video footage did not support Wagner's claim that his handcuff was pulled off without being unlocked. *Id.* at 75. Having determined "multiple discrepancies" in Wagner's account of the incident, the investigator found Wagner's claim of assault by Farris, Beachy, Walker, and Self could not be substantiated and recommended closing the matter. ECF 75, Ex. 1 at 74, 75.

### c. November and December 2013 Records

The State Defendants have filed Wagner's segregation confinement logs in order to demonstrate that he received or was offered and refused his meals. *Id.* at 152, 437. The log shows Wagner refused out-of-cell activity on November 1, 8, and 11, 2013, refused a shower on November 4 and 5, 2013, and accepted showers on November 8 and 12, 2013. *Id.* at 152.

On December 15, 2013, Wagner showed a cup of feces to a correctional officer that he intended to throw at the next officer who opened his cell door slot. *Id.* at 438. On December 16, 2013, he dumped three cups of feces in the toilet and gave the officer the containers to place in a biohazard bag. ECF 75, Ex. 1 at 438. On December 2, 15, and 28, Wagner refused to uncover his cell window. *Id.* at 438-39. The record notes Wagner was provided his meals ("feed-up"). *Id.* He also refused recreation several times. *Id.*

On December 13, 2013, Shearin approved limiting Wagner to three ARPs per month for one year based on his abuse of the process. ECF 75, Ex. 1 at 157. In the two previous months

Wagner had filed 28 ARPs. *Id.* This decision was approved by the Commissioner's office. *Id.* at 156. Shearin's decision was made in accordance with Department Directive OPS.185.0002 (Administrative Remedy Procedure). *Id.* at 170. Nevertheless, Wagner filed 65 ARPs between December 19, 2013 and January 6, 2015. *Id.* at 158-163. As a result, numerous ARPs were procedurally dismissed for exceeding the approved limit. ECF 75, Ex. 1 at 159-162.

### d. December 30, 2013, Infraction Report

On December 30, 2013, Wagner was issued an infraction notice for threatening a member of the correctional staff. Wagner said: "I'm healing up so you know what that means. Don't be the first one in when you come in to get me. I'm going to kill one of these bitches." *Id.* at 180. Wagner then pointed to the top of his door where he had several containers full of what he claims were "piss and shit." *Id.* Wagner stated that "the next one to open this slot gets it." *Id.* The officer ordered Wagner to relinquish the containers and Wagner refused. *Id.* The officer also saw a homemade punching bag in the cell with the names of correctional officers written on it. ECF 75, Ex. 1 at 180. Wagner refused to sign the notice of disciplinary hearing. *Id.* at 181.

Officer Ruby represented that Wagner waived his right to appear at the hearing and refused to sign the waiver of appearance. *Id.* at 186. Wagner was found guilty of one charge of threatening a correctional officer. *Id.* at 184, 191. He refused to sign the notice of decision. *Id.* at 193. On December 31, 2013, Wagner was placed on staff alert. ECF 75, Ex. 1 at 188.

### e. December 31, 2013, Serious Incident Report

A Serious Incident Report (SIR-NBCI-2013-82) was prepared following the cell extraction on December 31, 2013. ECF 75, Ex. 1 at 249-345. The report included the written statements of corrections staff involved in the incident. *Id.* at 253, 254-255, 257-267. Also in the report were photographs taken after the incident. *See* ECF 75, Ex. 1 at 280-345. They depict

Wagner, his cell, his body armor, the milk containers, and the sign from Wagner's cell that said: "I'M AT PEACE WITH LORD READY TO DIE ARE YOU?"  *Id.*

The Report determined that on December 31, 2013, a cell extraction team was assembled after Romesburg conducted a wellness check on Wagner, who had covered his cell door with a sign that stated: "I'm at peace with Lord, ready to die are you?"  *Id.* at 257.[25]  Wagner would not remove the sign or comply with orders so that his well-being could be ascertained.  *Id.* Defendants Gordon, Preston, Crites, and Ritchie started the extraction, but Wagner threw a carton of unknown liquid substance (believed to be urine and feces) at the officers, striking them with the liquid.  ECF 75, Ex. 1 at 252.  Officer Crites fired six rounds from the pepper ball launcher, but the rounds were ineffective because Wagner had fashioned body armor from pillows and sheets.  *Id.* at 254. Wagner went to the toilet to fill another container, and Ritchie applied a burst of pepper spray toward him.  *Id.* at 254. Gordon ordered Wagner to get on his knees and be handcuffed.  Wagner did not comply.  *Id.*  Gordon then ordered the door closed.

 Lt. Robert Cross and Lt. Sires went to Wagner's cell door and directed Wagner to come to the door to be handcuffed.  Wagner complied.  The Lieutenants then escorted Wagner to Housing Unit #1 Medical Room, where he was evaluated for pepper spray exposure and an injured lip.  *Id.* at 272-274, 252, 254.  Wagner was strip searched, photographed, and offered a decontamination shower, which he refused.  ECF 75, Ex. 1 at 252.  Defendant Preston was treated for exposure to bodily fluids.  *Id.*  Officers Gordon, Crites, Romesburg and Ritchie refused medical attention.  *Id.*

Lt. Cross, who prepared the Serious Incident Report (*Id.* at 249-278), concluded that all force was used in good faith, that the level of force used was appropriate and consistent with

---

[25] The text of the sign sometimes appears in the record with a comma after the word Lord.

applicable policies, and commended all staff for displaying professionalism and restraint after being assaulted by a violent offender. ECF 75, Ex. 1 at 255. The IID was notified. *Id*. at 275-276.

Wagner refused to provide a written statement for inclusion in the report. *Id*. at 271.

### f.  Investigation of Internal Investigation Division (IID)

In September 2014, based on a letter received from Wagner, the IID investigated the incidents of December 31, 2013, and January 1, 2014.[26] *Id.* at 231-243. Investigator Corey McKenzie conducted the inquiry and interviewed Wagner and corrections staff Robert Cross, Gregory Forney, Jeremy Crites, Shawn Romesburg, Earl Ritchie, Cristopher Preston, Justin Gordon, and Steven Roach. ECF 75, Ex. 1 at 214-220, 222. Further, the investigator reviewed Wagner's prison and medical records and the video tape of the December 31, 2013, use of force incident.[27] *Id.* at 211-224.

The report of the interview with Wagner states, in part, *id.* at 213:

> Inmate Wagner told me that evening (December 31, 2013) he and Shawn Romesburg COII who was assigned as the D-tier Officer had exchanged words. Inmate Wagner told me that Sgt. Gordon later arrived at the cell door and asked him to come to the cell door and cuff up and that he refused. He stated it was then Sgt. Gordon called out and asked him to come to the cell door and cuff up and that he refused. He stated it was then Sgt. Gordon called out unresponsive inmate and that he (Inmate Wagner) was standing at the cell door yelling "I'm not unresponsive there [sic] trying to kill me." He told me the other officers arrived to the cell and that he went to the back of the cell. Inmate Wagner told me that he had saved rotten hard boiled eggs and beef gravy and had tied it to the cell door so when the door opened it would fall on the officers. Inmate Wagner also stated that he had made body armor from pillows and torn sheets and braces for his arms, neck, and groin area. He told me when the door opened and he was pepper sprayed, he was hit with the electric shield and that Officer Crites shot him in the face with the pepper ball gun in the upper body. Inmate Wagner stated that the

---

[26] The investigation also addressed an incident on July 24, 2014, which is not at issue here. ECF 75, Ex. 1 at 214.

[27] The December 31, 2013, cell extraction was recorded. ECF 75, Ex. 1 at 255. The State Defendants have not filed a copy of it with their motion.

cell door was closed for approx twelve (12) to fifteen (15) minutes and that he was coughing and bleeding from the mouth.

I asked Inmate Wagner if he attempted to throw a liquid substance on the officers.  He replied "No."

Inmate Wagner told me that Lieutenant Robert Cross and Lieutenant Thomas Sires came to his cell and that Lt. Cross gave him (Wagner) his word that no one would touch him.

Inmate Wagner told me the cell door was opened and he stepped out of the cell and he was cuffed and taken to medical. He told me that Kristi Cortez, RN took only his vital signs. Inmate Wagner told me he was then taken to the strip cage and was denied a decontamination shower and was denied the opportunity to write an inmate statement.

Inmate Wagner told me that he was then taken to C-tier and put in an Isolation cell and that the water was turned off.

Inmate Wagner then began to tell me about an alleged assault he says occurred the following day (January 1, 2014) where correctional staff again used the same weapons to extract him from his cell.

Inmate Wagner told me that officers entered his cell picked him up slammed him to the ground and began kicking and punching him and that Sgt. Forney and Sgt. Roach never stopped the officers.

Inmate Wagner told me that Sgt. Forney stated "That bastard is puking blood" and that the officers stood him up and Officer Preston kneed him in the stomach and that he went to his knees and puked again.

Inmate Wagner told me that Sgt. Gordon told him to put on a jumpsuit and before he had the chance to put the jumpsuit on Officer Preston hit him in the stomach. He told me that after he got the jumpsuit on he was taken to medical and while he was in the medical room he complained to the nurse that his handcuffs were too tight.  He told me Sgt. Gordon was telling the nurse that there was nothing wrong with him and that there were photographs taken of him while he was in the strip cage.  He told me he was then taken to WCI where he was put in an isolation cell in [the] medical department and placed on Suicide Watch.

McKenzie spoke to Cross, who advised that there were no incidents reported involving

Wagner on January 1, 2014.  ECF 75, Ex. 1 at 214.  Sgt. Forney stated that he had not worked in

Housing Unit # 1 since July of 2013, when he was assigned to the Support Services Building.  *Id.*

Forney denied assaulting Wagner at any time.  *Id*. at 215.

Crites acknowledged he was involved in the incident of December 31, 2013.  ECF 75, Ex. 1 at 215.  Crites explained that Sgt. Justin Gordon was in charge and that they conducted a wellness check on Wagner.  *Id.*  Officer Preston "was on the shield," Richie had a can of pepper spray, and Crites had the pepper ball gun.  *Id*. at 215.  Crites told the IID investigator, *id*.:

> … Officer Shawn Romesburg COII who was assigned as the tier officer stood back while they conducted the wellness check.  Sgt. Crites told me that Sgt. Gordon called for the cell door to be opened and that he (Gordon) held the door so it opened just about six inches or so.  Sgt. Crites told me when the door was cracked open that there was a liquid substance thrown through the door striking all the officers at the door. He told me Inmate Wagner reached for containers and that he fired the pepper ball gun striking Inmate Wagner and Officer Ritchie sprayed Inmate Wagner with a burst of pepper spray.  Sgt. Crites told me that the pepper ball gun had no effect on Inmate Wagner because Inmate Wagner had made body armor from pillows he had tied around his body, sheet he had wrapped around his arms and that he made a face mask.

Further, Crites stated that Gordon closed the cell door and that was the last involvement that the officers who were struck with the liquid substance had with Wagner.  ECF 75, Ex. 1 at 215.  Crites denied assaulting Wagner. *Id*.

The account of the IID investigator's interview with Ritchie on September 24, 2014, is reported as follows, *id*. at 216:

> . . . Officer Ritchie told me that Inmate Wagner had his cell door window covered and that he was asked by Sgt. Gordon to take part in the wellness check.  Officer Ritchie told me the cell door was cracked open about six inches and that he and Sgt. Gordon, Officer Preston, and Officer Crites were struck with a liquid substance.  He told me Officer Crites fired the pepper ball gun and he sprayed a quick burst of pepper spray before the cell door was closed by Sgt. Gordon.
>
> I asked Officer Ritchie to tell me what occurred next. He told me that he and the others went to clean up and that the officers struck with the liquid substance did not return to the cell. Officer Ritchie told me that Lt. Robert Cross and Lieutenant Thomas Sires arrived to D-tier and cuffed Inmate Wagner and took him to medical.
>
> I asked Officer Ritchie if he assaulted Inmate John Wagner.  He replied,

"No Sir, I had no physical contact with Inmate Wagner during the wellness check." Officer Ritchie told me that he did assist with removing the sheets Inmate Wagner had wrapped around his arms following his removal from the cell and then he completed a report.

The IID investigator recounted his interview of Officer Shawn Romesburg on September 24, 2014, as follows, ECF 75, Ex. 1 at 216-17:

Officer Romesburg told me that he had conducted several tier walks (security rounds) throughout the evening and inmate Wagner had his cell door window covered. Officer Romesburg told me that inmate Wagner only responded a couple of times while he conducted his tier walks and refused to respond during the later tier walks prompting the wellness check because Inmate Wagner had covered his cell door window with feces. Officer Romesburg told me Sgt. Gordon called for the cell door to be opened and that Sgt. Gordon stopped the cell door from opening any more than about twelve (12) inches when a liquid substance was thrown out hitting all of us. Officer Romesburg told me that the cell door was opened for about ten (10) seconds and that Officer Crites fired the pepper ball gun a couple of times and the cell door had to be forced shut. He told me that after the cell door was closed he was tasked with staying to observe Inmate Wagner following the UOF [use of force]. He told me that Lt. Cross and Lt. Sires arrived and asked him to go [to] the D-tier officer's station. He told me Inmate Wagner was wrapped up with what looked like body armor to include a face mask. Inmate Wagner was then handcuffed by the Lt. and escorted to medical to be evaluated. Officer Romesburg told me he then went to clean up.

I asked Office Romesburg if he physically assaulted Inmate Wagner during the incident. He replied "No, sir.  I had no hands on contact with Inmate Wagner."

The IID investigator then reported his interview with Cross, ECF 75, Ex. 1 at 217:

Lt. Cross told me that Sgt. Gordon conducted a wellness check of the cell housing Inmate John Wagner  # 371133 and that he was notified to report to HU # 1 after the officers had been assaulted with the liquid substance.  He told me that he and Lt. Sires arrived and talked with Inmate Wagner who had a sign on his door about dying and that Inmate Wagner agreed to exit the cell. Lt. Cross told me that Lt. Sires applied the hand cuffs and that the two of them escorted Inmate Wagner to medical where he was evaluated by Kristi Cortez, RN.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

He told me Inmate Wagner was wearing homemade body armor that included goggles and a breathing apparatus. Lt. Cross told me that following the medical evaluation scissors were needed to cut off what Inmate Wagner had wrapped around his body and arms and he was taken and placed in a Contingency

Cell without further incident.

The account of the interview with Christopher Preston provides, ECF 75, Ex. 1 at 218: [28]

> Officer Preston told me he [was] assigned as the C-tier officer.  He told me he talked with Officer Romesburg throughout the evening and Officer Romesburg mentioned to him that inmate Wagner had his cell door window covered most of the evening and wouldn't respond to him.  He told me Sgt. Gordon had assembled a couple of officers together to conduct a welfare check of Inmate Wagner.  He told me when Sgt.  Gordon called for the cell door to be opened Sgt. Gordon allowed the door to be opened only about six (6) to twelve (12) inches and when the door did open he  and the other officers were hit with a liquid substance.  He told me Officer Crites fired the pepper ball gun. Officer Ritchie applied the pepper spray and the cell door was closed. He told me that he, Officer Crites, Officer Ritchie, and Sgt. Gordon went to clean up.  He told me Lt. Cross and Lt. Sires arrived at the cell, talked with Inmate Wagner, got him to exit the cell, took him to medical and had him evaluated.  Officer Preston told me that following Inmate Wagner's evaluation he retrieved the scissors used to remove the body armor Inmate Wagner had wrapped around him and then he was taken to a Contingency Cell on C-tier.

Next, the investigator recounted his interview with Gordon, *id.* at 218-19:

> Sgt. Gordon told me that Officer Romesburg was working D-tier and couldn't get a response from Inmate Wagner when he was conducting his security rounds.  Sgt. Gordon told me Inmate Wagner had a sign in his cell door window about dying. He told me that he called for Officer's [sic] Crites, Ritchie and Preston to conduct a welfare check. He told me Officer Preston was on the shield, Officer Ritchie had a can of pepper spray and Officer Crites was armed with the pepper ball gun. Sgt. Gordon told me when he called for the door to be opened a liquid substance was thrown from inside the cell, striking all of the officers including him. He told me  Officer Crites fired the pepper ball gun and Officer Ritchie sprayed a burst of pepper spray into the cell. He told me he forced the cell door closed and Inmate Wagner would not comply.  He told me Lt. Sires and Lt. Cross arrived and attempted to talk with Inmate Wagner and initially Inmate Wagner would not comply.  He told me after a few minutes Inmate Wagner agreed to come out of the cell and was handcuffed taken to medical and evaluated. Sgt. Gordon told me that Inmate Wagner had made body armor from pillows, sheets and had made a face mask with a plastic bag with goggles. Sgt. Gordon told me they needed scissors to remove the armor before placing Inmate Wagner in a Contingency Cell on C-tier.

> I asked Sgt. Gordon if he had any physical contact with Inmate John

---

[28] Preston is a cadet for the Cumberland Police Department and is no longer in the employ of NBCI.  ECF 75, Ex. 1 at 218.

Wagner # 371133 during this incident.  He replied "I had no hands on contact with Inmate Wagner."

I asked Sgt. Gordon if he assaulted Inmate Wagner in any way during the incident. He replied "No, I didn't touch him."

The interview with Sgt. Steven Roach[29] is recounted in the IID report, ECF 75, Ex. 1 at 219:

I asked Sgt. Roach if he remembered working in HU # 1 and being involved in an incident on December 31, 2013 that involved Inmate Wagner # 371133. He replied "No Sir, I was scheduled off on Personal Leave that day." [sic as to quote mark] Sgt. Roach told me he did remember an incident on the following day where Inmate Wagner was found unresponsive in his cell and was taken to medical." [sic]  Sgt. Roach told me that he and the officers who removed Inmate from his cell did complete Incident Reports.

I asked Sgt. Roach if he assaulted Inmate John Wagner # 371133.  He replied "No, Sir."

Roach gave the IID investigator four Incident Reports.[30] The reports were completed by Roach, Chuck McMillan, Matthew Eagleson, and Jonathan Sharon. He also reviewed the medical report generated by Lisa Shell, R.N.  The investigator determined "review of this report shows no indication that Inmate John Wagner # 371133 sustained any injuries as Inmate Wagner indicated in my interview with him the previous day. Medical documentation shows Inmate Wagner was later transferred to the WCI Infirmary (SOH) and placed on Suicide precautions."  *Id*. at 219. [31]

Wagner was taken to the WCI Infirmary upon order of Colin Ottey, M.D. *Id*. at 222, 391. Wagner's medical record from the medical visit on January 1, 2014, states, *id*. at 391:

---

[29] Roach is no longer employed at NBCI.  ECF 75, Ex. 1 at  219.

[30] It is unclear why Roach, who is no longer in the employ of NBCI, provided the incident reports of the other officers.  The reports are part of the record in this case.  ECF 75, Ex. 1 at 389-391.

[31]   The court assumes "SOH" refers to Special Observation Housing.

Patient was found in cell by officers lying with face in small amount of blood. Patient is responsive when first seen in medical. Patient talking, complaining about cuffs being too tight and how this is a case for IU. Patient has difficulty holding eyes open, eyes appear red. Vital signs are wnl [within normal limits]. No source can be determined for blood found in cell. Mucus membranes are moist. No open areas seen in mouth or on face. Nasal passages appear red and irritated. Dr [sic] notified. Patient transferred to infirmary for observation.

The medical record also indicates that Wagner ambulated without assistance and was escorted to medical by three officers. ECF 75, Ex. 1 at 393. He told the nurse that his belly was a little tender and he had been "coughing up blood since Oct." *Id.* The record indicates that he spit up about 90 ml. of blood tinged sputum. *Id.* There was a small smear of blood on the tip of his nose. *Id.* He complained of a swollen and painful wrist and was given two Tylenol. *Id.* No wounds were noted. *Id.* Wagner was able to move all extremities and his sensation was intact. ECF 75, Ex. 1 at 393. Wagner was dressed in a suicide smock. *Id.*

The IID report notes that Gordon was assigned as the Escort/Relief Officer in Charge (OIC) on January 1, 2014, and was called to HU#1 by Roach to stand by in case he was needed to help remove Wagner from his cell. *Id.* at 220. Forney was assigned as the Support Services Building Officer in Charge. *Id.* Gordon and Forney escorted Wagner to the WCI Infirmary following the removal of Wagner from his cell and for evaluation by medical personnel. *Id.*[32]

The IID investigator summarized the video of December 31, 2013, noting the sequence of events, ECF 75, Ex. 1 at 221:

- Officer Romesburg arrived to cell 1-D-64 with a Safe Barrier covering the cell door at approx. 7:37:28.

- Sgt. Gordon, Officer Ritchie arrive to the cell at approx. 7:40:00, Sgt. Gordon removes the Safe Barrier at approx. 7:40:18.

- Officer Crites and Officer Preston arrive to the cell at approx. 7:41:13.

---

[32] Defendants do not indicate whether these actions were recorded.

- Sgt. Gordon calls for the cell door to be open at approx. 7:41:24.   At approx. 7:41:36 cell door opens when a liquid substance is thrown through the opening striking the officers.

- Sgt. Gordon forces the cell door closed at approx. 7:41:50 and attempts to talk with Inmate Wagner until 7:45:39 when he (Gordon) and Officers Crites and Ritchie leave the scene, leaving Officer Romesburg at the cell to monitor Inmate Wagner.

- Lt. Robert Cross and Lt. Thomas Sires arrive on the tier at approx. 7:55:30 and to the cell 1-D-64 at approx. 7:55:48.

- Lt. Sires assisted by Lt. Cross begin to cuff Inmate Wagner at approx. 7:56:52.

- Sgt. Gordon calls for the cell door (1-D-64) to be opened at approx. 7:57:38.

- Inmate Wagner backs out of the cell at approx. 7:57:51 and is escorted off the tier by Lt. Cross and Lt. Sires.

The IID investigator observed Wagner being taken out of his cell.  ECF 75, Ex. 1

at 228.  The IID investigator did not observe any staff assault of Wagner.  *Id.*[33]

The IID investigator met with correctional officer Jonathan Sharon on September 30,

2014, concerning the events of January 1, 2014.  The report reads, *id.* at 222:

> Officer Sharon told me the tier officer found Inmate Wagner unresponsive lying on the floor with what looked like blood on the floor around him and on the walls.  Officer Sharon told me that he was part of a three (3) man team put together by Sgt. Roach to conduct a wellness check. . . .

> Officers Chuck McMillan COII and Matthew Eagleson COII entered the cell.  Officer McMillan entering the cell first and covering Inmate Wagner with the shield while he and Officer Eagleson placed handcuffs on Inmate Wagner. Officer Sharon told me that Inmate Wagner was taken to medical and evaluated and shortly thereafter was transferred to the WCI Infirmary.

---

[33] The IID investigator also requested an archived video of the alleged incident of January 1, 2014.  None was provided to him.  ECF 75, Ex. 1 at 221.  The record does not state whether such a video exists.

I asked Officer Sharon if he could give me a time frame of how long the three officers were in the cell. Officer Sharon replied "Maybe a minute."

Officer Sharon denied assaulting Wagner or observing McMillan or Eagleson assault

Wagner while inside the cell. *Id.*

The IID investigator also met with correctional officer Chuck McMillan. The report

states, ECF 75, Ex. 1 at 223:

> Officer McMillan told me that he did work in HU#1 on that day [January 1, 2014] and remembers Sgt. Roach asking him to bring the shield to C-tier for a wellness check. Officer McMillan told me that he entered the cell and placed the shield over Inmate Wagner and that Officers Sharon and Eagleson handcuffed Inmate Wagner.
>
> Officer McMillan told me that they weren't in the cell very long and Inmate Wagner was taken to medical and evaluated.
>
> I asked Officer McMillan if he assaulted Inmate Wagner while in the cell. He replied "Absolutely not."
>
> I asked Officer McMillan if he observed Officer Sharon or Officer Eagleson assault Inmate Wagner while in the cell. He replied "No."

Correctional Officer Eagleson's interview with the IID investigator is reported as

follows, ECF 75, Ex. 1 at 223-24.

> I asked Officer Eagleson if he recalled being involved in an incident with Inmate John Wagner #371133. Office Eagleson replied it wasn't an incident it was a welfare check that involved Sgt. Roach and Officers McMillan and Sharon.
>
> I asked Officer Eagleson to tell me what he could remember about the wellness check. Officer Eagleson told me Inmate Wagner was lying on the floor of the cell with a red liquid substance around him and that he, McMillan and Sharon entered the cell cuffed Inmate Wagner got him to his feet and assisted Inmate Wagner who walked under his own power to the medical room.
>
> I asked Officer Eagleson if he could tell me how long he and the other officers were in the cell. Officer Eagleson told me they might have been in the cell 30 seconds.
>
> Officer Eagleson told me Inmate Wagner was taken to the strip cage and strip searched prior to being transferred to the WCI Infirmary.

I asked Officer Eagleson if he assaulted Inmate John Wagner #371133. He replied "No."

I asked Officer Eagleson if Officer McMillan or Officer Sharon assaulted Inmate Wagner. He replied "No."

I asked Officer Eagleson if there was anything he wanted to add or change before I concluded the interview.  Officer Eagleson told me "The wellness check was textbook."

The IID Report states there are no photographs available for Wagner's January 1, 2014 visit to the medical department.  ECF 75, Ex. 1 at 224.

Based on his review of this evidence, IID Investigator McKenzie concluded that Wagner's account of the incidents contained "multiple discrepancies" and did "not coincide" with staff reports, interviews, or video footage.  *Id*. at 229.  The investigator noted that Wagner admitted throwing a liquid in the direction of staff on December 31, 2013, which "triggered the Use Of Force by staff…."  *Id*.  Further, "Wagner also utilized a make shift body armor in an anticipation of his non-compliant behavior when staff attempted to conduct the wellness check on 12/31/13."  *Id*. at 229.  The report also determined that Wagner "initiated" the assault on December 31, 2013, and concluded that the officers had "followed protocol to gain control of the situation."  *Id*.

As to the alleged incident on January 1, 2014, the investigator found the staff and medical reports did not corroborate Wagner's allegations.  *Id.* at 388-390, 391-393, 399.

### g.  September 2014 Infraction Reports

In the State's Memo, ECF 75 at 7, the State refers to incidents involving Wagner that occurred on September 12, 2013 and September 24, 2013.  *See also* ECF 75, Ex. 1 at 31 ("September 12, 2013 Incident Infraction Report").  However, the documents that follow reflect that the events occurred on September 12 and September 24 of 201**4**, not 201**3**.  *See* ECF 75, Ex.

1 at 32-50. Therefore, their relevancy is not apparent.

On September 12, 2014, an infraction report was issued based on Wagner's refusal to follow direct orders to be handcuffed and escorted for medical evaluation for unknown bleeding. ECF 75, Ex. 1 at 32. Correctional Officer Robert Gomer had observed Wagner "holding two weapons and standing in a pool of blood." *Id.* After Wagner refused orders from staff to be handcuffed, pepper spray was administered through the opening at the bottom of Wagner's cell door. After approximately one minute, Wagner came to the security slot and allowed handcuffs to be applied. *Id.* at 37. Wagner was found guilty of violating Rule 400 (disobeying a direct order) and Rule 105 (possession of weapons). *Id.* at 38. The report notes that an extraction team had to be used to gain possession of the weapons, with force, endangering the lives of at least five officers. *Id.* at 38. The hearing examiner's report indicated that this was Wagner's fourth weapons charge during his incarceration. *Id.* at 39. Wagner refused to sign the notice of the decision. *Id.* at 40, 44.

Officer Cody Gilpin wrote an infraction report on September 24, 2014, after Wagner spit on Officer Gilpin. ECF 75, Ex. 1 at 50. Wagner became agitated and aggressive while being escorted to his cell and threatened, "'If I had blood in my mouth I would spit it in your face bitch.'" *Id.* at 50. Once inside the cell Officer Mallow removed Wagner's leg irons. *Id.* Defendants Rounds and Gilpin were backing out of the cell while maintaining control of Wagner with a "security tether." *Id.* Wagner turned his head and spit, striking Gilpin on the arm. *Id.* Gilpin and Rounds redirected Wagner to the wall to gain control and prevent further assault, and Wagner actively pulled against the officers. After several direct orders, Wagner complied and the handcuffs were removed. Wagner refused to cooperate with the staff while they tried to take photographs, *id.* at 50, nor would he sign a notice of disciplinary hearing. EFC 75, Ex. 1 at 51,

56.

Wagner waived his appearance at the hearing.  *Id.* at 56.  The hearing examiner found Wagner guilty of five charges: engaging in a disruptive act; assault or battery on staff; interference or resistance of the performance of staff duties; disobeying a direct order; and demonstration of disrespect or use of vulgar language.  *Id.* at 50, 60.  Wagner refused to sign the notice of the decision.  *Id*. at 60.

The hearing examiner's decision noted Wagner's staff alert status.[34]  *Id*. at 50.  On September 24 and 29, 2014, Wagner's staff alert status was reviewed and continued, and he was referred to the psychology department for assessment. *Id* at 63-64.

### h.  November 13, 2014 Infraction Report

The State also included in the records an infraction report of November 13, 2014.  ECF 75, Ex. 1 at 135.  Again, the relevancy is not apparent.

The report indicates that on November 13, 2014, Wagner threatened defendant Rounds by stating: "I'm gonna shit you down, you white cracker bitch."  *Id.*  He also tried to spray feces and urine to flood the tier.  *Id.*  Wagner refused to sign the notice of disciplinary hearing, but waived his right to appear at the hearing and signed a waiver. *Id*. at 138, 143, 146.

At the hearing, Wagner was found guilty of threatening a correctional officer by stating, "I'm gonna shit you down you cracker bitch."  *Id*. at 140-41, 144.  Wagner was found not guilty of the four other offenses charged.  *Id*.  Wagner refused to sign the notice of the decision.  *Id*. at 143.  Wagner appealed on the grounds he had not been informed of the infraction, served with a copy, or given a chance to defend himself.  ECF 75, Ex. 1 at 148-149.  Warden Frank Bishop reviewed and denied the appeal.  *Id*. at 147.  On November 11, 2014, Wagner was placed again

---

[34] Staff Alert status indicates an inmate is a danger not only to staff, but a threat to the safety and security of the institution.  ECF 75, Ex. 1 at 36.

on staff alert.  *Id*. at 150.

## 2.  Medical Records

The State Defendants filed more than 300 pages of Wagner's medical records.  ECF 75,

Ex. 2.  These records include the following:

a.  November 6, 2013: Kristi Cortez, R.N. recorded that Wagner reported he was injured
    by officers during a use of force on October 31, 2013.  Wagner reported discomfort in
    his ribs that is subsiding, cracked teeth, and vomiting of blood which he reported
    stopped the day prior to his medical visit.  The physical examination showed no
    cracked or chipped teeth were observed. Wagner's gait was steady and he rose from
    the exam table without difficulty.  He was provided with Motrin. (ECF 75, Ex. 2 at
    16).

b.  November 7, 2013: Dr. Ava Joubert, M.D., ordered a chest x-ray for Wagner. The
    results indicated clear lungs and no acute fracture, dislocation, or subluxation. *Id*. at
    18. Neither the Medical Defendants nor Wagner discuss this procedure in their
    filings.

c.  November 11, 2013:  Nurse Cortez saw Wagner for his complaints as to right hand,
    left ribs, left shoulder, and back discomfort for an altercation ten days prior. *Id*. at 19.

d.  November 16, 2013: Colin Ottey, M.D., examined Wagner for his complaints of
    wrist, back, shoulder, and thumb pain. Wagner reported gagging and coughing blood
    until two days before.  Ottey noted the x-rays were normal. Physical exam revealed
    tenderness in left and right shoulders and right wrist with moderate pain with motion.
    Wagner was prescribed an ace bandage, muscle rub, and analgesics. *Id*. at 23-25.

e.  December 1, 2013:  Dawn Hawk, R.N. reported Wagner was seen for complaints of
    vomiting blood. His lungs were clear and no distress was noted.  ECF 75, Ex. 2 at 26.

f.  December 12, 2013: Nurse Cortez saw Wagner for complaints of dry skin, wrist,
    back, shoulder, right thumb, and rib pain, and vomiting blood. No tenderness was
    noted, although there was pain with movement. Wagner was prescribed an analgesic
    for pain and skin lotion. *Id*. at 28-29,

g.  December 31, 2013: Nurse Cortez saw Wagner "for chemical use of force." *Id*. at 32.
    The report states: "Patient denies medical complaint. Patient reports busted lip from
    pepper ball round." *Id*. The report states "[p]atient has bleeding from superficial
    injury to lower lip." *Id*. Nasal draining and coughing related to chemical exposure
    were observed. *Id.* Wagner's lungs were clear and there was no eye swelling. *Id.*

h.  January 1, 2014:  Lisa Shell, R.N. wrote: "Patient was found in cell by officers lying
    with face in small amount of blood. Patient is responsive when first seen in medical.

Patient talking, complaining about cuffs being too tight and how this is a case for IU. Patient has difficulty holding eyes open, eyes appear red. Vital signs are within normal. No source can be determined for blood found in cell. Mucus membranes are moist.  No open areas seen in mouth or on face. Nasal passages appear red and irritated. Dr. notified. Patient transferred to infirmary for observation." ECF 75, Ex. 2 at 35.

i.  <u>January 1, 2014:</u> Karen Myers, R.N. recorded that Wagner ambulated without assistance. His gait was steady. No assistive devices were needed. He complained of a tender "belly" because he had been coughing blood "since Oct." A small smear of blood was noted on the tip of his nose. No wounds were noted. Wagner spit up 90 ml of blood tinged sputum. The report indicates Wagner was awaiting transfer for suicide precautions. *Id.* at 38.

j.  <u>January 2, 2014:</u> Renato Espina, M.D. wrote that Wagner was admitted for observation due to observation of possible "bleeding." No bleeding site was found in his oral cavity and lips.  A psychiatric follow-up was ordered.  Wagner complained of wrist pain from "tight cuffs." *Id.* at 40.

k.  <u>January 2, 2014:</u> Delores Adams, R.N., recorded that Wagner was standing in his cell unassisted.  His gait was steady.  The report notes "slight edema to the lower lid of his [right] eye, and small ulceration to the corner of his lower lip"[35] Wagner denied vomiting, nausea, bleeding, or pain.  *Id.* at 41.

### 3. Declarations

Defendants have filed several declarations.  *See* ECF 75, Ex. 3-10.  *See* Declaration of John Beachy, ECF 75, Ex. 3; Cinda Walker, *id.*, Ex. 4; Jamie Farris, *id.*, Ex. 5; Leroy Conrad, *id.*, Ex. 6; William Gillium, *id.*, Ex. 7; Shawn Romesburg, *id.*, Ex. 8; Jeremy Crites, *id.* Ex. 9; and Matthew Eagleson, *id.*, Ex. 10. In their declarations, all of the officers denied Wagner's allegations that they participated in an assault against him on October 31, 2013.[36]  *See* ECF 75, Exs. 3-10.  Wagner also alleged that during removal of handcuffs, his arm was injured because it was pulled through the slot door. *Id.*, Exs. 3-7.  Each declarant attests that he or she "did not improperly assault"  Wagner and has no knowledge that any other correctional officer assaulted

---

[35] This was previously described as a canker sore.  ECF 75, Ex. 2 at 40.

[36] Beachy, Walker, Farris, Conrad, and Gillium's declarations  read similarly.  *See* ECF 75, Exs. 3-7.

him in the manner alleged.  *Id.*, Exs. 3-10.  The declarants maintain that Wagner's allegations are false, and note Wagner's allegations were filed in ARP NBCI-3813013, and were the subject of an internal investigation and Investigative Report 13-35-01505.  *See id.*  Several of the declarants also assert that their prior statements to the investigating officer were accurately recounted in the investigation report.  *See, e.g., id.*, Exs. 3, 4, 5.

Wagner's allegations concerning the December 31, 2013, incident are addressed in declarations executed by Romesburg, Crites, and Gordon.[37]  ECF 75, Ex. 8-10.  These declarants attest to being familiar with allegations that each participated in an assault against Wagner on December 31, 2013, during which Wagner was forcibly extracted from his cell, and allegedly beaten, denied medical treatment, and denied access to materials to file a grievance.  *See id.*  Romesburg, Crites, and Gordon aver that Wagner's allegations are false.  Each declarant attests that he did not unlawfully assault Wagner and has no knowledge that any other correctional officer assaulted Mr. Wagner in the manner alleged on December 31, 2013.  ECF 75-8, 9, 10.  The declarants state: "The cell extraction was well-documented and found to be legitimate."  *See*, *e.g.*, ECF 5-8 (Declaration of Romesburg).

Further, the defendants note that IID investigated the claims and concluded there were discrepancies in Wagner's account, and that plaintiff's allegations did not coincide with staff reports, witness interviews, or video footage.  Each attests the statement he or she gave to the investigating officer was correctly recounted in the investigation report.  Further, each declares that he or she has never prevented Wagner from filing an ARP request and has no knowledge of any other correctional official denying Wagner access to the grievance process or interfering with his legal mail or access to the courts.  ECF 75-8, 9, 10.

---

[37] Romesburg, Crites, and Gordon's declarations read similarly.  *See* ECF 75, Exs. 8-10.

## C. Discussion

The State Defendants raise the Eleventh Amendment and qualified immunity[38] as defenses in this action. They also assert that they are entitled to summary judgment in their favor, arguing Wagner has failed to state a constitutional violation for use of excessive force, conditions of confinement, placing limitations on the filing of ARP and grievances, or the denial of due process.

### 1. Eleventh Amendment

Wagner brings his claims against the State Defendants in their official and personal capacities. ECF 15 at 3; ECF 16 at 3; ECF 17 at 2. As the Supreme Court explained in *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. N.Y.C. Dept. of Soc. Servs.,* 436 U.S. 658, 690, n. 55 (1978)) (citations omitted): "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *See also*, *e.g.*, *Huggins v. Prince George's Cnty.*, 683 F.3d 525, 532 (4th Cir. 2012) (treating suit against individuals in official capacity as suit against County). Thus, official capacity claims are subject to sovereign immunity under the Eleventh Amendment. *Graham*, 473 U.S. at 167; *accord Hafer v. Melo*, 502 U.S. 21, 25 (1991).

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State." The Eleventh Amendment did not *create* sovereign immunity; rather, it *preserved* the sovereign immunity that the states enjoyed prior to the formation of the Union. *See Alden v. Maine*, 527

---

[38] In light the determinations made herein, the court need not reach the State Defendants' qualified immunity defense.

U.S. 706, 724 (1999); *see also Sossamon v. Texas*, --- U.S. ---, 131 S. Ct. 1651, 1657-58 (2011). For this reason, states enjoy sovereign immunity from private suits brought by their own citizens.

Sovereign immunity precludes a private individual from suing an unconsenting state or an instrumentality of a state (also referred to as an "arm of the state") in federal court, absent waiver or a valid Congressional abrogation of sovereign immunity. *See Coleman v. Court of Appeals of Maryland*, , ⸺ U.S. ⸺, 132 S. Ct. 1327, 1333 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Board of Trustees of Univ. of Alabama v. Garett*, 531 U.S. 356 (2001); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States." (internal quotation marks and citation omitted)); *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013). The preeminent purpose of state sovereign immunity is to accord states the dignity that is consistent with their status as sovereign entities. *Fed. Mar. Comm'n v. S. Carolina State Ports Auth.*, 535 U.S. 743, 760 (2002).

However, the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), creates an exception to sovereign immunity that is applicable in suits for declaratory and injunctive relief against individual state officers, in order to prevent ongoing violations of federal law. *See generally Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002); *Idaho v. Coeur d' Alene Tribe of Idaho*, 521 U.S. 261, 269 (1997); *Edelman v. Jordan*, 415 U.S. 651, 662-65

(1974) (holding that although the Eleventh Amendment permits "prospective relief," it does not permit a "monetary award"); *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon*, 535 U.S. at 645 (internal quotation marks omitted).

Of import here, Wagner does not request prospective or declaratory relief. Moreover, under the Eleventh Amendment, a state, or one of its agencies or departments, is immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. *See Penhurst State School and Hospital v Halderman*, 465 U.S. 89, 100 (1984). Although the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code (2014 West), State Gov't. Art., § 12–201(a), it has not waived its immunity under the Eleventh Amendment to a suit of this kind in federal court.

"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). States and their officers, sued in their official capacities, are not "persons" subject to suit for money damages under 42 U.S.C. § 1983. *Will*, 491 U.S. at 71. Thus, Wagner's request for monetary damages against the State Defendants in their official capacities is barred by Eleventh Amendment immunity.

## 2. Excessive Force Claim

To proceed under 42 U.S.C. § 1983, a plaintiff must allege a violation of a federal constitutional right or a right secured by federal law. *Baker v. McCollan*, 443 U.S. 137, 140

(1979).  To state a claim under § 1983, a plaintiff must: 1) "allege the violation of a right secured by the Constitution and laws of the United States"; and 2) "show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir.), *cert. denied*, 132 S. Ct. 112 (2011).

A convicted inmate's claim of use of excessive physical force is examined in the context of the Eighth Amendment's prohibition against cruel and unusual punishment. *See Whitley v. Albers*, 475 U.S. 312, 319–21 (1986); *see also Wilkins v. Gaddy*, 559 U.S. 34 (2010) (per curiam); *Hudson v. McMillan*, 503 U.S. 1, 7–9 (1992).  "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *see also Makdessi v. Fields*, ____ F.3d ____, No. 13-7606, slip op. at 12 (4th Cir. March 12, 2015).  The use of force by a prison official violates an inmate's Eighth Amendment rights when such force is "inconsistent with contemporary standards of decency," *Estelle v. Gamble*, 429 U.S. 97, 103 (1976), or is "'repugnant to the consciousness of mankind.'"  *Wilkins*, 559 U.S. at 38 (citation omitted).

Eighth Amendment analysis asks whether the prison officials "acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).  In a claim for excessive application of force, the question is whether the correctional officers applied force "maliciously and sadistically for the very purpose of causing harm," rather than "in a good-faith effort to maintain or restore discipline." *Whitley*, 475 U.S. at 320–21 (internal quotation marks omitted). To satisfy the subjective component, a

claimant must show that a prison official acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).

In determining whether prison officials have acted maliciously and sadistically, a court should balance: 1) the need for the application of force; 2) the relationship between the need and the amount of force used; 3) the threat reasonably perceived by the responsible officials, and; 4*)* "any efforts made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 321.  The Eighth Amendment inquiry focuses on whether the "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson*, 503 U.S. at 6-7.  As noted, several factors are relevant.  *Whitley*, 475 U. S. at 321.

Notably, "'not every malevolent touch by a prison guard gives rise to a federal cause of action'" under the Eighth Amendment.  *Wilkins*, 559 U.S. at 37 (citation omitted).  Conversely, the absence of "significant" injury is not dispositive of a claim of excessive force.  *Id.* at 36-37.  Moreover, if force is applied maliciously and sadistically, liability is not avoided "merely because [the plaintiff] had the good fortune to escape without serious injury."  *Id.* at 37.  Put another way, there is no "de minimis" level of injury that is an acceptable result of excessive force under the Eighth Amendment.  *Id.* at 38-40.  But, the extent of an inmate's injury is one factor indicative of whether the force used was necessary in a particular situation.  In *Wilkins*, the Supreme Court stated: "This is not to say the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." 559 U.S. at 37 (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).  Thus, a court must look at "the nature of the force rather than the extent of the injury." *Wilkins,* 559 U.S. at 34.

As indicated, prison officials are charged with balancing competing governmental interests.  These include the maintenance of order; protection of correctional officers, prison staff

and other inmates; and inmates' rights to be free from cruel and unusual punishment.  *See Whitley*, 475 U.S. at 321.  When force is needed to keep order, correctional officers may have little time for considered reflection and must quickly and decisively balance the need to maintain order and restore discipline through force against the risk of injury to inmates.  *See Hudson*, 503 U.S. at 6; *see also Smith v. Ray*, ____ F.3d ____, No. 12-1503, slip op. at 10 (4th Cir. March 18, 2015) (analyzing an excessive force claim under the Fourth Amendment and stating:  "In considering the reasonableness of an officer's actions, we must consider the facts at the moment that the challenged force was employed."); *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).  Thus, in excessive force cases, the subjective component is measured by the same standard as the objective: "whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Id.*

The question of excessive force turns on the totality of the circumstance.  *See Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985); *Ray*, slip op. at 11.  In other words, the use of force must be considered "'in full context'. . . ."  *Ray*, slip op. at 12 (citation omitted).

In regard to the use of pepper spray by prison officers, "'[i]t is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas, or other chemical agents in quantities greater than necessary or for the sole purpose of inflicting pain.'" *Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996)) (emphasis omitted).  However, pepper spray is not "per se a cruel and unusual punishment," *McCargo v. Mister*, 462 F. Supp. 813, 818 (D. Md. 1978), and can be used to "control a recalcitrant inmate" without violating the Eighth Amendment.  *Williams*, 77 F.3d at 763.

There are three general areas in which courts have held that use of pepper spray or other chemical agents may constitute excessive force in violation of the Eighth Amendment. First, an Eighth Amendment violation has been found when an officer used far more than a reasonable quantity of a chemical agent. *See, e.g.*, *Furnace v. Sullivan*, 705 F.3d 1021, 1025 (9th Cir. 2013) (finding Eighth Amendment violation where officer discharged can of pepper spray until empty, and another officer joined in); *Lawrence v. Bowersox*, 297 F.3d 727, 732 (8th Cir. 2002) (same, where prisoner's entire cell was doused in pepper spray using fire-extinguisher-like device); *DeSpain v. Uphoff*, 264 F.3d 965, 978 (10th Cir. 2001) (same, where officer indiscriminately sprayed entire prison tier).

Second, Eighth Amendment violations have been found when a chemical agent was used without a prior verbal command, or after a prisoner had been subdued or had become compliant with an officer's instructions. *See Tedder v. Johnson*, 527 F. App'x 269 (4th Cir. 2013) (stating that pepper spray employed on visibly sick inmate may constitute excessive force); *Johnson v. Blaukat*, 453 F.3d. 1108 (8th Cir. 2006) (finding triable Eighth Amendment claim where officers allegedly used pepper spray as a first resort without prior verbal command); *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002) (finding triable Eighth Amendment claim where there was evidence that inmate "did not intentionally disobey [officer], use profanity or abusive language, or threaten any correctional officer, and . . . was [pepper] sprayed without warning").

Courts have also concluded that the Eighth Amendment can be violated when, after a prisoner is pepper sprayed (even for a legitimate reason), officers then withhold appropriate medical attention. *See, e.g.*, *Walker v. Bowersox*, 526 F.3d. 1186, 1189 (8th Cir. 2008) (finding Eighth Amendment violation where prisoner was barred from showering or changing for three days after pepper spray incident); *Norton v. City of Marietta*, 432 F.3d 1145, 1153-54 (10th Cir.

2005) (finding triable Eighth Amendment claim where officer pepper sprayed inmate's eyes for 5-7 seconds from two inches away, as if "'he was spray-painting [plaintiff's] face,'" and then ignored inmate's pleas for assistance, other than "toss[ing] some water in his eyes"); *Foulk v. Charrier*, 262 F.3d 687 (8th Cir. 2001) (affirming Eighth Amendment verdict against officer where, after officer "sprayed pepper spray directly into [inmate's] face," inmate "received no medical care and had no ability to wash off the pepper spray, [and] continued to feel its painful effects for several days").

The Fourth Circuit's 2008 decision in *Iko v. Shreve*, *supra*, 535 F.3d 225, involving use of pepper spray in extracting an inmate from his cell, illustrates each of the three categories. There, the Court observed that "some dispersal of pepper spray" was unquestionably "warranted in carrying out the cell extraction," because the inmate "did not initially comply with orders to 'cuff up.'" *Id.* at 239. Nevertheless, the *Iko* Court held that the defendant officer was not entitled to qualified immunity for his use of pepper spray because, in the light most favorable to the inmate, the officer "deployed several additional bursts of pepper spray even after [the inmate] attempted to comply with orders," *id.* at 239-40; the inmate was "docile and passive throughout the cell extraction," *id.* at 239; the officer's "final burst of pepper spray was deployed *after* [the inmate] had lain down on the floor of his cell," *id.* at 240 (emphasis in original); and, "far from trying to ameliorate the effects of the pepper spray, [the officer] and the extraction team never changed [the inmate's] clothing, never removed the spit mask covering his nose and mouth, and never secured him any medical treatment for the exposure." *Id.*

However, if an inmate repeatedly ignores official commands, multiple applications of pepper spray have been found reasonable. *See Williams*, 77 F.3d at 763 (finding no Eighth Amendment violation where officer administered pepper spray after prisoner asked "Why?" in

response to command); *Jackson v. Morgan*, 19 F. App'x. 97, 102 (4th Cir. 2001) (upholding use of pepper spray twelve times when inmate refused to comply with commands to move from his cell); *Norris v. Detrick*, 918 F. Supp. 977, 984 (N.D.W. Va. 1996) (upholding use of two blasts of pepper spray when inmate refused to return to his cell during lockdown).  Use of chemical agents is reasonable when a prisoner attempts to escape or evade an officer's control.  *See Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999).  Finally, use may be also reasonable when an officer is attempting to maintain order and discipline in the institution.  *Santiago v. Walls*, 599 F.3d. 749, 757 (7th Cir. 2010) (determining that Eighth Amendment was not violated where pepper spray was used to break up inmate fight); *Combs v. Wilkinson*, 315 F.3d. 548, 558 (6th Cir. 2002) (holding use of pepper spray during prison riot appropriate).

Wagner alleges corrections officials used excessive force against him on four occasions: October 31, 2013, December 13, 2013, December 31, 2013, and January 1, 2014.

### a.  October 31, 2013

I have already recounted the facts, and need not restate all of them here.

In their declarations, defendants Beachy, Walker, Farris, and Conrad deny that they improperly assaulted Wagner or witnessed others do so after he became belligerent at an adjustment hearing. Indeed, one defendant who is alleged to have been involved, Officer Self, attests that he was not present and had no involvement with Wagner at all on that day.

The record demonstrates that Wagner became belligerent during his adjustment hearing. As he was escorted out, it became necessary to regain control over him. Control was quickly regained and Wagner was secured in a cell without further incident.  ECF 75, Ex. 1 at 65-133; ECF 75-3, 4, 5, 6, 7.  The Affidavit of Dashawn Peterkin (ECF 19-Attachment), submitted by Wagner, does not address the need for the officers to maintain security and control.

As discussed, the IID investigator determined that Wagner's claim of excessive force could not be substantiated.  Moreover, the medical report of November 6, 2013, reveals no chipped teeth; Wagner's gait was steady; and Wagner rose from the exam table without difficulty.  In addition, his x-rays were normal.

The Court is mindful that it cannot make credibility determinations or resolve disputes of material fact with respect to a summary judgment motion.  On the other hand, it should not allow factually unsupported claims to proceed to trial.  Viewing this claim in the light most favorable to Wagner, there are no genuine issues of material fact, and the State Defendants are entitled to summary judgment.

### b.  December 13, 2013

Wagner claims he was assaulted by Gregory, Shaffer, Adams, Logston, and Roach in retaliation for filing grievances. He states Shaffer refused to honor his order for double-cuffing. Wagner's arm and wrist were twisted and his head was slammed on the ground.

As far as can be discerned, the State Defendants do not specifically address Wagner's claim of excessive use of force on this date. No declarations have been filed in this regard. Accordingly, summary judgment will be denied as to this claim.

### c.  December 31, 2013

As noted, Wagner acknowledges that he covered his cell window with a sign indicating he was ready to die, readying cartons with a foul substance for throwing at correctional officers, and donning homemade protective gear as he waited in ready for the officers.  The record contains many photographs of Wagner, his cell, his body armor, and the sign he hung in his cell. ECF 75, Ex. 1 at 280-345.  The record reflects that officers attempted to enter Wagner's cell to ascertain his well-being, were hit with the substance he threw at them, and he refused to comply

with their orders to submit to handcuffs.  The pepper balls used against Wagner proved ineffective because of the body armor that Wagner made.  Pepper spray was then applied to gain compliance, and the officers retreated, leaving the cell door closed.  According to the IID report, officers remained outside the cell door and attempted to speak to Wagner.  ECF 75, Ex. 1 at 221.  Some ten minutes later, supervisory officers arrived and Wagner agreed to handcuffing.  He was escorted to the medical unit.  Wagner refused a decontamination shower.  ECF 75, Ex. 1 at 252.

In this incident, correctional officers acted to maintain inmate and staff safety in a dangerous situation.  The force used was brief, tempered, and measured to gain control over a volatile situation.  In their declarations, Romesburg, Crites, and Gordon each attest they did not improperly assault Wagner, nor do they have knowledge of any other officer doing so.  ECF 75-8, 9, 10.  The IID report refutes Wagner's claims of an assault at the hands of Gordon, who told the investigator that he had no physical contact with Wagner at all.  *Id*. at 218-219.  The declarations submitted by Wagner do not refute the defendants' exhibits.

Construing the facts in the light most favorable to Wagner, he has not shown that the officers acted maliciously and sadistically to cause harm, rather than in a good-faith effort to maintain or restore discipline.  Without the requisite culpable state of mind, there is no genuine issue of material fact.  Therefore, summary judgment will be entered as to this claim.[39]

### d.  January 1, 2014

The State Defendants deny the occurrence of a second cell extraction on January 1, 2014.  ECF 75, n.3.  Defendant Cross told the IID investigator there is no record of the incident.  ECF 75, Ex. 1 at 214.  The IID investigator found the staff and medical reports did not corroborate Wagner's allegations.  *Id.* at 388-390, 391-393, 399.

---

[39] Wagner's claim alleging Gordon dictated the documentation of injuries to medical providers will proceed, as discussed herein.

To be sure, Wagner's allegations concerning the alleged January 1, 2014, incident repeat some of the same allegations of fact he presented concerning the December 31, 2013 incident. Nevertheless, the State Defendants have not provided any declarations specifically addressing the alleged January 1, 2014 incident.  And, when judging the evidence in the light most favorable to Wagner, and drawing all references in his favor, the court concludes genuine issues of material fact remain as to whether this incident occurred as alleged.  Accordingly, summary judgment will be denied as to this claim.

### 3.  Denial of Access to Medical Care

Wagner claims that Gordon instructed Nurse Cortez on December 31, 2013, that Wagner "was not injured and how she [Cortez] should write it even though [he] was right in front of her bleeding profusely and clearly having a difficult time breathing."  ECF 16 at 11.  In his declaration accompanying his reply (ECF 49-1 at 4), Wagner adds that Gordon "not only told RN Cortez not to document my injuries, but he was dictating to her what to write. It's obvious to me that she did as told because I could clearly see the computer screen and saw that she in fact 'did not' document my injuries as described by me or as undoubtedly were apparent to her and any lay person." *Id*.  Notably, Wagner does not allege suffering specific injury as a result of the actions.

A prison official may be found to have been deliberately indifferent to an inmate's serious medical needs by intentionally interfering with medical treatment. *See Miltier v. Beorn*, 896 F.2d 848, 854–55 (4th Cir. 1990).  To the extent Wagner claims Gordon acted with deliberate indifference, in violation of the Eighth Amendment, the State Defendants provide no documentation or affidavits to refute Wagner's assertions. The omission is troubling, especially as it casts into doubt the veracity of the medical record completed after the incident of December

31, 2013.

Genuine material facts are in dispute as to Gordon's actions.   Therefore, summary judgment will be denied as to Gordon.

In regard to the remaining State Defendants, Wagner neither claims they were personally involved nor responsible for the actions alleged under principles of supervisory liability. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (stating supervisory liability requires showing (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by plaintiff).

Accordingly, as to this claim, summary judgment will be entered in favor of all State Defendants, except for Gordon.

### 4.  Due Process

Prisoners retain rights under the Due Process Clause.   But, prison disciplinary proceedings are not part of a criminal prosecution and the full array of rights due a defendant in such proceedings does not apply.   *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (*citing Morrissey v. Brewer*, 408 U.S. 471, 488 (1972)).

In prison disciplinary proceedings where an inmate faces the possible loss of diminution credits, he is entitled to certain due process protections.   These include: (1) advance written notice of the charges against him; (2) a written statement of the evidence relied on and the reasons for taking any disciplinary action; (3) a hearing where he is afforded the right to call

witnesses and present evidence when doing so is not inconsistent with institutional safety and correctional concerns, and a written decision; (4) the opportunity to have non-attorney representation when the inmate is illiterate or the disciplinary hearing involves complex issues; and (5) an impartial decision-maker. *See Wolff*, 418 U.S. at 564-571.  As long as the hearing officer's decision contains a written statement of the evidence relied upon, due process is satisfied. *See Baxter v. Palmigiano*, 425 U.S. 308, 322, 323 n. 5 (1976). Substantive due process is satisfied if the disciplinary hearing decision was based upon "some evidence." *Superintendent, Mass. Correctional Institute v. Hill*, 472 U.S. 445, 455 (1985).  As long as there is some evidence in the record to support a disciplinary committee's factual findings, a federal court will not review their accuracy.

Wagner's claims that he was denied due process because he did not receive a notice of the infraction charge, was not given a chance to represent himself, and was not allowed to call witnesses, is plainly refuted by the record.  Wagner does not indicate the date of the infraction or hearing, however.  Therefore, I shall assume that Wagner's reference is to the December 30, 2013, infraction report issued after he stated, "I'm healing up so you know what that means. Don't be the first one in when you come in to get me.  I'm going to kill one of these bitches." ECF 75, Ex. 1 at 180.

The record shows Wagner waived his right to appear at the hearing.  *Id*. at 193. Moreover, he later refused to sign the notice of decision. The hearing officer's decision contained a written statement of the evidence relied upon.  Due process was satisfied.  Consequently, summary judgment will be entered as to this claim.

### 5.  ARP and Grievance Process

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e et seq., requires a prisoner to exhaust administrative remedies before filing suit in federal court.  It provides, in pertinent part:

(a) Applicability of administrative remedies

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  42 U.S.C. § 1997e(h).  The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner.  Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by a defendant.  *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has made an administrative remedy procedure "available" to Maryland state prisoners, within the meaning of 42 U.S.C. § 1997e(a), for the submission of "grievance[s] against    . . . official[s] or employee[s] of the Division of Correction ["DOC"]."  Md. Code (2008 Repl. Vol., 2011 Supp.),

§ 10-206(a) of the Correctional Services Article ("C.S."); *see generally* C.S. §§ 10-201 *et seq.*

Regulations promulgated by DPSCS concerning the administrative remedy procedure ("ARP")

define a "grievance' to include a "complaint of any individual in the custody of the [DOC] . . .

against any officials or employees of the [DOC] . . . arising from the circumstances of custody or

confinement." Code of Maryland Regulations ("COMAR") 12.07.01.01B(8).[40]

Wagner's complaints that he was denied access to the ARP and Grievance Process are

refuted by the documented number of his filings. *See, e.g.*, ECF 75, Ex. 1 at 158-163. Wagner's

constant barrage of filing ARPs constituted an abuse of the process, prompting the administrative

decision to limit his filings to three per month for a one-year period, in accordance with DOC

policy directives. Wagner does not specify what harm he sustained as a result of this limit or the

alleged failure of defendants to provide him with complaint forms or to respond, to his

satisfaction, to his many requests. Wagner does not specify he was prevented from bringing any

claim in court, nor does he raise a claim of denial of access to the courts.

---

[40] Maryland appellate case law indicates that the administrative grievance procedure does not encompass "'every kind of civil matter that could be brought by a DOC inmate.'" *Massey v. Galley*, 392 Md. 634, 646, 898 A.2d 951, 958 (2006) (citation omitted). Rather, it applies only to matters that "relate to or involve a prisoner's 'conditions of confinement.'" *Id.* at 651, 898 A.2d at 960 (citation omitted). Thus, the grievance procedure does not apply to requests for public information under the Maryland Public Information Act, *see id.*, nor does it apply to medical malpractice claims against private medical service providers who treat inmates under contract with the DOC. *See Abramson v. Correctional Med. Servs., Inc.*, 359 Md. 238, 753 A.2d 501 (2000).

Moreover, the administrative grievance procedure does not apply to claims for compensation for disabilities resulting from "personal injury arising out of and in the course of [an inmate's] work for which wages or a stipulated sum of money was paid by a correctional facility," C.S. § 10-304, for which a claim to a different administrative body, the Sundry Claims Board, is the exclusive remedy. *See Dixon v. DPSCS*, 175 Md. App. 384, 927 A.2d 445 (2007). On the other hand, the grievance process does apply to a wide variety of claims that arise out of the conditions of confinement, even if the grievance process cannot provide a comprehensive remedy for such claims, such as tort claims of assault and battery against prison officers. *See McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989).

Consequently, even when viewing Wagner's allegations in the light most favorable to him, there are no genuine issues of material fact.  Thus, the State Defendants are entitled to summary judgment as to this claim.

### 6. Conditions of Confinement

Inmates may state an Eighth Amendment claim as to the conditions under which they are confined.  "The Supreme Court has long recognized that a prisoner may have a state-created liberty interest in certain prison confinement conditions…." *Prieto v. Clarke*, ____ F.3d ____, No. 13-8021, Slip. Op. at 5-6 (4th Cir. March 10, 2015).  Indeed, the Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement." *Makdessi, supra*, slip op. at 12 (citing *Farmer v. Brennan*, 511 U.S. at 832).  On the other hand, "[t]he Constitution does not mandate comfortable prisons. . . ." *Farmer*, 511 U.S. at 832.

Conditions that "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U. S. 337, 347 (1981).  However, conditions that are merely restrictive, or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society." *Id.*

> In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements - that "the deprivation of [a] basic human need was *objectively* 'sufficiently serious,' and that '*subjectively* the officials act[ed] with a sufficiently culpable state of mind.'"

*Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original; citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (*citing Wilson v. Seiter*, 501 U.S. 294, 298-300 (1991)).

To establish a sufficiently culpable state of mind, there must be evidence that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson*, 501 U. S. at 298. In other words, "the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. North Carolina Dept. of Corrections,* 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)). Conduct is not actionable under the Eighth Amendment unless it transgresses bright lines of clearly-established pre-existing law. *See Maciariello v. Sumner*, 973 F. 2d 295, 298 (4th Cir. 1992).

In *Brice v. Virginia Beach Corr. Ctr.*, 58 F. 3d 101, 105 (4th Cir. 1995), the Court said that "deliberate indifference in this context lies somewhere between negligence and purpose or knowledge: namely, recklessness of the subjective type used in criminal law." However, "a prison official cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Id.* at 105. And, "even a subjective standard may be proven with circumstantial evidence[.]" *Makdessi, supra,* slip op. at 14.

The objective prong of a conditions claim requires proof of an injury. "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir.1993). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir.2003). Demonstration of an extreme deprivation proscribed by the Eighth Amendment requires proof of a serious or significant physical or emotional injury resulting from the challenged conditions. *See Odom v. South Carolina Dept. of Corrections*, 349 F. 3d 765, 770 (4th Cir. 2003).

Wagner avers that on November 2, and 3, 2013, he was placed in a cold cell without a mattress, toiletries, or running water.  He claims there were feces and urine on the floor.  ECF 75, Ex. 1 at 6.  Additionally, he claims that between December 31, 2013, and January 30, 2014, he was kept in a cell without a mattress, linen, toiletries, or running water.  Notably, Wagner does not claim he suffered a serious or significant physical or emotional injury from the conditions he alleges.  He does not claim defendants knew that he faced a serious danger to his safety and they could avert the danger easily yet they failed to do so.  Further, the times he was allegedly placed in these conditions was brief; in one case it was just two days, and in the other one month.

For these reasons, Wagner's allegations are not sufficient to state an Eighth Amendment claim for unconstitutional conditions of confinement.  Therefore, summary judgment will be entered in favor of the State Defendants as to this claim.

## CONCLUSION

For the reasons stated above, the Medical Defendants' motion to dismiss (ECF 44) will be granted in part and denied in part.  Defendants Bennett, Gilmore, and Beeman will be dismissed from the case.  Dismissal will be denied as to defendants Cortez, Durst, Ottey, and Wexford.

The State Defendants' motion for summary judgment (ECF 75) will be granted in part and denied in part, subject to renewal no later than May 13, 2015.  Summary judgment will be denied as to Gordon, subject to renewal as to plaintiff's claims concerning Gordon's alleged interference with plaintiff's medical treatment by directing the falsification of documentation of Wagner's medical condition after the cell extraction on December 31, 2013.  Summary judgment will be denied, subject to renewal, as to plaintiff's claims of excessive force used against him on

December 13, 2013, and January 1, 2014.   And, summary judgment will be denied as to plaintiff's claim that Officer Eagleson solicited an inmate to harm Wagner, subject to renewal. Summary judgment will be granted in favor of the State Defendants as to all remaining claims.

A separate Order follows.


<u>March 19, 2015</u>                       <u>        /s/                  </u>
Date                                          Ellen Lipton Hollander
                                                 United States District Judge